**RHODE ISLAND ASSOCIATION OF REALTORS, INC., Plaintiff, Appellee,**

v.

**Sheldon WHITEHOUSE, Attorney General for the State of Rhode Island, Defendant, Appellant.**

**No. 99–1812.**

United States Court of Appeals, First Circuit.

Heard Nov. 4, 1999.

Decided Dec. 14, 1999.

**28**

Rebecca Tedford Partington, Asst. Attorney General, with whom Brenda A. Doyle, Special Asst. Attorney General, was on brief, for appellant.

Mark W. Freel, American Civil Liberties Union, Rhode Island Affiliate, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

Certain public records in Rhode Island are available upon request but come with strings attached. This case concerns one of those strings: the prohibition on using records so obtained for commercial solicitation. *See* R.I. Gen. Laws § 38–2–6. Responding to a petition for declaratory and injunctive relief filed by the Rhode Island Association of Realtors (the Association), the district court granted the requested remedies, ruling that the operation of the statute abridged the Association's right to free expression. *See Rhode Island Ass'n of Realtors v. Whitehouse*, 51 F.Supp.2d 107 (D.R.I.1999) [*RIAR*]. The Rhode Island Attorney General appeals, insisting that the Association lacks standing to challenge the law. We affirm.

## I. BACKGROUND

In accordance with the conventional summary judgment standard, we limn the facts in the light most favorable to the Attorney General, indulging all reasonable inferences in his favor. *See Coyne v. Taber Partners I*, 53 F.3d 454, 456 (1st Cir. 1995).

The Association is a trade group that represents licensed real estate agents and brokers. Pursuant to the Access to Public Records Act, R.I. Gen. Laws §§ 38–2–1 to –15 (the Act), the Association asked for and obtained from the Department of Business Regulation (DBR) information concerning the identities of persons to whom real estate licenses recently had been issued. The Association wishes to use these data to recruit new dues-paying members but thus far has refrained from soliciting the listed license-holders because it fears prosecution under R.I. Gen. Laws § 38–2–6.

First enacted in 1979, the statute provides:

**Commercial use of public records.**— No person or business entity shall use information obtained from public records pursuant to this chapter to solicit for commercial purposes or to obtain a commercial advantage over the party furnishing that information to the public body. Anyone who knowingly and willfully violates the provision of this section shall, in addition to any civil liability, be punished by a fine of not more than five hundred dollars ($500) and/or imprisonment for no longer than one year.

R.I. Gen. Laws § 38–2–6. When the Association requested the license information, DBR made it aware of potential criminal penalties under the Act. Although no person has ever been charged criminally under section 38–2–6, the Attorney General has never disclaimed it, and a related provision, section 38–2–8, requires the Attorney General to investigate and, when appropriate, to prosecute violations.

As a matter of longstanding policy, the Attorney General does not issue advisory opinions to private parties, so that option was not open to the Association. The Attorney General sometimes furnishes such opinions to public entities on questions of state law, *see id.* § 42–9–6, but he has never promulgated an opinion anent the scope of section 38–2–6. He has, however, issued at least one opinion to a state college touching upon the subject matter. *See* R.I. Att'y Gen. Unofficial Op. No. PR94–06 (Apr. 21, 1994) (discussed *infra*).

Reluctant either to execute or to abandon its contemplated deployment of the information gleaned from DBR, and seeing no other way of resolving the issue, the Association sued. Invoking 42 U.S.C. § 1983 and the First and Fourteenth Amendments, it asked the federal district court to declare section 38–2–6 unconstitutional as violative of the free-speech rights of the Association, its members, and Rhode Island real estate licensees in general, and to enjoin the then-Attorney General, Jeffrey Pine, from enforcing the ban on commercial solicitation.

Attorney General Pine moved to dismiss the complaint. He contended that it showed neither a sufficiently definite plan to engage in conduct that would transgress section 38–2–6 nor a sufficiently imminent threat of prosecution. The Association objected to this motion and in due course filed a cross-motion for summary judgment. In opposition, the Attorney General confined his argument to the threshold question of justiciability: he embellished both of the contentions delineated in the motion to dismiss, suggested that the court should defer to his interpretation of the challenged law, and alleged a lack of state action sufficient to support a claim under 42 U.S.C. § 1983. The Association filed a rejoinder, which included a supporting affidavit.

The matter lay fallow for several months. Attorney General Pine did not seek reelection. In November 1998, the voters chose Sheldon Whitehouse to succeed him. Whitehouse took office on January 5, 1999, and was substituted as the named defendant in this suit. *See* Fed. R.Civ.P. 25(d)(1). In June, the district court granted the Association's motion for summary judgment. *See RIAR,* 51 F.Supp.2d at 114. This appeal followed. Up to that point, Attorney General Whitehouse had not expressed an opinion as to either the constitutionality of section 38–2–6 or its applicability to the Association's proposed course of action.

## II. ANALYSIS

■ On appeal, the Attorney General does not challenge the district court's determination that section 38–2–6 is unconstitutional to the extent that it "prohibits the use of public information 'to solicit for commercial purposes.' " *RIAR,* 51 F.Supp.2d at 114 (quoting statute).[1] We must therefore accept that determination unless we find that the Attorney General is correct in his thesis that the district court should not have heard the case.

The Attorney General grounds this position mainly on a theory that the Association lacked "standing" to pursue its quest for declaratory and injunctive relief. But he uses this term loosely, in a way that brings to mind a panoply of related concepts: standing, ripeness, and mootness. We address these justiciability concerns separately and then treat the Attorney General's assertion that the lower court lacked subject-matter jurisdiction because the operation of section 38–2–6 does not involve state action. Consistent with the summary judgment standard, we afford plenary review. *See Coyne,* 53 F.3d at 456.

---

**1.** The Attorney General mistakenly suggests that our opinion in *National Revenue Corp. v. Violet,* 807 F.2d 285 (1st Cir.1986), prevents a state attorney general from agreeing that a

state statute is unconstitutional. That case specifically rejected so extreme a view. *See id.* at 288.

## A. *Standing.*

■ Inasmuch as the Attorney General couches his justiciability concerns in terms of standing, we start there. Like all justiciability doctrines, standing is a necessary concomitant to the court's power to adjudicate a case. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *United States v. AVX Corp.,* 962 F.2d 108, 113 (1st Cir.1992). Despite its importance, the doctrine remains "a morass of imprecision." *New Hampshire Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 12 (1st Cir.1996). We know, however, that standing encompasses both "constitutional requirements and prudential considerations," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), and that the former derive from Article III's admonition that a federal court may decide only actual "Cases" and "Controversies," U.S. Const. art. III, § 2. Here, the Attorney General frames his objection in constitutional terms and, in all events, it is unnecessary to address separately prudential considerations. *See Berner v. Delahanty,* 129 F.3d 20, 24 (1st Cir.1997) ("[A] realistic risk of future exposure to [a] challenged policy ... is sufficient to satisfy not only the standing requirements that Article III imposes, but also the prudential concerns that sometimes trouble courts."), *cert. denied,* 523 U.S. 1023, 118 S.Ct. 1305, 140 L.Ed.2d 470 (1998).

■ The burden of establishing standing rests with the party who invokes federal jurisdiction. *See Bennett v. Spear,* 520 U.S. 154, 167–68, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Accordingly, the Association must show that (1) it personally has suffered some actual or threatened injury, (2) the injury fairly can be traced to the challenged conduct, and (3) a favorable decision likely will redress it. *See Valley Forge,* 454 U.S. at 472, 102 S.Ct. 752; *Vote Choice, Inc. v. DiStefano,* 4 F.3d 26, 36 (1st Cir.1993).

Neither the second nor the third of these showings has independent significance in this instance. To the extent that the Association had suffered a cognizable injury at the time of filing—a matter which we discuss below—that injury can be traced directly to the looming enforcement of section 38–2–6 and can be fully redressed by declaratory and injunctive relief. *See New Hampshire Right to Life,* 99 F.3d at 13. Thus, the lens of our inquiry narrows to the existence *vel non* of an actual or threatened injury.

■ Although inquiries of this sort are both context-contingent and situation-specific, the case law furnishes some guideposts. Generally speaking, a "conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Art. III.'" *Diamond v. Charles,* 476 U.S. 54, 64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). Moreover, a private party need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Because it ordinarily will be too late to obtain a federal forum once the state has initiated criminal proceedings, *see Younger v. Harris,* 401 U.S. 37, 41, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), persons who are confronted by criminal laws of questionable constitutionality should be afforded recourse to the federal courts as soon as state sanctions have been threatened. *See ACLU v. Florida Bar,* 999 F.2d 1486, 1493 (11th Cir. 1993). The threat, however, must be credible. *See New Hampshire Right to Life,* 99 F.3d at 14. Therein lies the rub.

■ We have framed the applicable rule in the following way:

In a pre-enforcement challenge to a statute carrying criminal penalties, standing exists when "the plaintiff has alleged an intention to engage in a course of con-

duct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution."

*Id.* (quoting *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). In practice, it is often difficult to distinguish between fears that are chimerical and those that are realistic. The best that we have been able to do is to insist that, in these purlieus, standing requires an "objectively reasonable" fear of prosecution. *Id.; see also Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (stating that "[a]llegations of a subjective 'chill' [produced by government intelligence-gathering] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). Determining objective reasonableness demands a frank consideration of the totality of the circumstances, including the nature of the conduct that a particular statute proscribes. *See New Hampshire Right to Life,* 99 F.3d at 16; *cf. Camilo–Robles v. Zapata,* 175 F.3d 41, 43 (1st Cir.1999) (holding that reasonableness for qualified immunity purposes requires "an objective inquiry into the totality of the circumstances").

■ Here, the Association intends to solicit new members—an activity protected by the First Amendment, *see Innovative Database Sys. v. Morales,* 990 F.2d 217, 220–22 (5th Cir.1993)—so the "intention to engage" element is established. So, too, the proscription element, because the plain language of section 38–2–6 pretermits commercial solicitation. Thus, the pivotal question reduces to whether the Association faced a credible threat of prosecution when it filed suit. Our search for an answer takes place against a background understanding that when First Amendment values are at risk, courts must be especially sensitive to the danger of self-censorship. *See Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *Meese v. Keene,* 481 U.S. 465, 473, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987).

We recently canvassed much of the relevant case law, *see New Hampshire Right to Life,* 99 F.3d at 14–15, and it would be pleonastic to rehearse it here. We reiterate only the bottom line: "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 15; *accord North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 710 (4th Cir.1999) (quoting from this passage), *cert. denied,* —— U.S. ——, 120 S.Ct. 1156, —— L.Ed.2d —— (2000); *Commodity Trend Serv. v. CFTC,* 149 F.3d 679, 687 (7th Cir.1998) (same); *see also Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428 (11th Cir.1998) (agreeing "with the First Circuit's admonition that the credible threat of prosecution standard 'is quite forgiving' " in the First Amendment context) (citing *New Hampshire Right to Life,* 99 F.3d at 14).

Several factors indicate a credible threat of prosecution here. Section 38–2–6 is regulatory in nature, prohibits precisely the conduct that the Association wishes to undertake, and sets severe sanctions for noncompliance. Although the Attorney General questions the second of these assumptions, there is simply no plausible way to read the statutory text so that it exonerates the Association's proposed solicitation.

This conclusion is buttressed by the circumstances. For one thing, the Association was specifically informed about the existence of section 38–2–6 when it obtained the names of real estate licensees from DBR. The clear implication of this direct monition, particularly when coupled with the unambiguous language of the statute itself, was that the commercial use of these records was foreclosed and that transgressions would not go unpunished.

For another thing, the Attorney General had issued no statement interpreting the statute to mean anything other than what its plain language portends. To the contrary, in response to a request from Rhode Island College a few years previously, the Attorney General had opined that although the college could not condition the release of records upon recipients' certifying that they would not use the records to solicit for commercial purposes, it could require recipients to acknowledge their awareness of the commercial use prohibition contained in section 38–2–6. *See* R.I. Att'y Gen. Unofficial Op. No. PR94–06.

The precise wording of this portion of the opinion is revealing. After reprinting section 38–2–6 in full, the Attorney General states that "[i]f the College or any other individual entity learns that the information is in fact being used in contravention of the Act, the College may then notify the Attorney General, who will then take the appropriate course of action as provided for in Section 38–2–6 of the Act." *Id.* at 2. This statement sent a clear message that, in April of 1994, the Attorney General deemed section 38–2–6 to be alive and well. Thus, the Attorney General, far from eschewing enforcement, placed an imprimatur upon the provision barring the use of public records for commercial solicitation.

To sum up, by obtaining the names of new licensees from DBR, the Association took a significant first step along a path blocked by the statutory proscription. Its interest was manifest and the parameters of the activity that it proposed to undertake were discrete and well-defined.[2] Inasmuch as the statute appeared to cover that activity, we believe it was reasonable for the Association to infer under all the circumstances that a real possibility of prosecution awaited if it decided to proceed. This is no hypothetical case; the Association had standing when it filed suit because a sufficiently imminent threat of injury loomed.

We add a coda. In resisting this conclusion, the Attorney General relies heavily on the fact that the state has never pursued criminal charges under section 38–2–6. His argument has two flaws. First, the record contains no realistic basis for a suggestion that the statutory provision, enacted only twenty years ago, has fallen into desuetude. Second, predicting the future from the past is perilous business. There are a minimum of three possible explanations for a history of nonenforcement: a statutory prohibition may have proven to be an effective deterrent, or the proscribed behavior may be difficult to detect, or the state may have decided not to enforce the statute. The threat of future prosecution varies depending on which of these theories most likely accounts for the historical pattern.

We consider the possibilities in reverse order. Given the Attorney General's advisory opinion to Rhode Island College and the warning the Association received from DBR, it hardly can be said that the state had disavowed enforcement of section 38–2–6. By like token, there is nothing in the record to suggest that commercial solicitation somehow flies below law enforcement radar. Here, then, the first explanation seems by far the most plausible, especially since the Association provides uncontradicted affidavit support for the proposition that section 38–2–6 acts as a deterrent. In view of the pellucid language of the statute and the warnings that it would be enforced, it is not illogical to assume that this phenomenon probably accounts for the absence of prior prosecutions.

---

**2.** For this reason, the cases relied upon by the Attorney General, all of which involved either plaintiffs who were unlikely to engage in the proscribed activity, *see, e.g., Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Rodos v. Michaelson,* 527 F.2d 582, 585 (1st Cir.1975), or plaintiffs who had formulated no firm plans for doing so, *see, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Alabama State Federation of Labor v. McAdory,* 325 U.S. 450, 460, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945), are inapposite.

In all events, the Supreme Court repeatedly has found standing to mount pre-enforcement challenges to laws that had never been enforced. *See, e.g., United Farm Workers*, 442 U.S. at 302, 99 S.Ct. 2301; *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). We emulate these examples. It would be little short of perverse to deny a party standing because the statute she challenges is so potent that no one dares violate it, especially when the result is widespread self-censorship.[3] *See American Booksellers*, 484 U.S. at 393, 108 S.Ct. 636.

### B. *Ripeness.*

■ If standing is a question of who, then ripeness—which shares standing's constitutional and prudential pedigree, *see Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 242–44, 73 S.Ct. 236, 97 L.Ed. 291 (1952)—is a question of when. Its basic function is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). To determine whether a case is ripe for review, a federal court must evaluate the fitness of the issue presented and the hardship that withholding immediate judicial consideration will work. *See id.* at 149, 87 S.Ct. 1507. Thus, the plaintiff must adduce facts sufficient to establish both fitness and hardship. *See Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 535 (1st Cir.1995). These concepts are related but distinct: fitness "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed," whereas hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* (citations and internal quotation marks omitted).

As these preliminaries indicate, standing and ripeness may substantially overlap. The imbrication is nowhere more apparent than in pre-enforcement challenges. The existence *vel non* of a credible threat of prosecution, critical to the injury-in-fact requirement for standing, factors into both branches of the ripeness equation. This is as it should be, for the reasonableness of the fear of enforcement is at the core of both standing and ripeness. *See Adult Video Ass'n v. Barr*, 960 F.2d 781, 786 (9th Cir.1992) ("Our conclusion that a reasonable threat of prosecution exists, for purposes of standing, effectively dispenses with any ripeness problem."), *vacated*, 509 U.S. 917, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), *reinstated in relevant part*, 41 F.3d 503 (9th Cir.1994); *see also Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244–45 (11th Cir.1998) (considering ripeness and standing together in respect to a pre-enforcement challenge).

■ Despite this overlap, we assume, favorably to the Attorney General, that both standing and ripeness are contested here. To establish ripeness in a pre-enforcement context, a party must have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity. This gives a precise shape to disobedience, posing a specific legal question fit for judicial review. A showing that the challenged statute, fairly read, thwarts implementation of the plan adds the element of hardship.

■ Applying these general precepts, we have little difficulty in concluding that the Association's claim was ripe when filed.

---

3. The Attorney General warns that by finding justiciability here, we will be inviting savants to scour the statute books in search of obscure provisions that may successfully be challenged, thus generating hefty fees under 42 U.S.C. § 1988. Although courts assuredly should guard against such bounty hunting, this case poses no such danger. The Association has articulated a clear and convincing reason for wanting to engage in a particular course of action which lies at the core of its mission as a membership organization, and section 38–2–6 bars the way.

This is not a case of statutory ambiguity but, rather, one that presents a single, purely legal question: Does Rhode Island's prohibition on using public records for commercial solicitation unconstitutionally restrain free expression? The Association has described a concrete plan to recruit new members—an activity plainly proscribed by the text of section 38-2-6—and no one has suggested any valid reason why resolution of the apparent conflict should await further factual development. Since the controversy was well-defined and amenable to complete and final resolution, it was fit for judicial review.

Similarly, the Association refrained from carrying forward its plan because it reasonably feared prosecution under section 38-2-6. The Association thus faced the "direct and immediate dilemma," *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir.1992), of choosing between "the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believe[d] to be constitutionally protected activity," *Steffel*, 415 U.S. at 462, 94 S.Ct. 1209. Because lost opportunities for expression cannot be retrieved, delaying or denying resolution of the issue would have worked a substantial hardship. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 82, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

### C. Mootness.

"The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Steffel*, 415 U.S. at 459 n. 10, 94 S.Ct. 1209. Building on this foundation, the current Attorney General argues that certain representations made by him and his predecessor after service of the Association's complaint defused the controversy. Although the Attorney General makes this argument under the heading of standing, it is really an argument for mootness—but not a winning one.

Mootness derives from the same constitutional and prudential concerns as standing and ripeness. What distinguishes mootness is its focus on ongoing events. Even if a justiciable controversy exists when litigation begins, Article III requires a federal court to depart the field if the controversy later abates, that is, if ongoing events have wiped the slate clean or changed the topography so that the court's opinion would be purely advisory. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *see also Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (explaining that a case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome").

In contrast to standing, the burden of establishing mootness rests on the party raising the issue. *See Davis*, 440 U.S. at 631, 99 S.Ct. 1379; *New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 91 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 2336, 144 L.Ed.2d 234 (1999). This burden is heavy. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In an effort to sustain it, the Attorney General points to several statements indicating, with varying degrees of certitude, that the Association's planned activity falls outside the scope of section 38-2-6. We examine those statements.[4]

---

4. In finding a credible threat of prosecution, the district court relied in part on the possibility that the new attorney general might not have agreed with the litigation position taken by his predecessor. *See RIAR*, 51 F.Supp.2d at 112. This was error, Attorney General Whitehouse says, because the court should have presumed continuity between administrations. We need not become embroiled in this dispute, for Attorney General Pine's representations, even if binding on his successors, do not suffice to render the controversy moot.

In the memorandum that accompanied his motion to dismiss, Attorney General Pine admitted that the Association alleged an intent to use licensee information "to solicit new members," but asserted without amplification that this activity could not be regarded as "a solicitation for a commercial purpose." He moderated his stance somewhat in his objection to the Association's summary judgment motion, asserting that its proposal did "not appear to allege a violation of § 38–2–6." Chiming the same note, his successor states in his appellate brief that the Association's proposed course of action "does not appear to fall within the parameters of the commercial use prohibition." We do not believe that these statements render the controversy moot.

On its face, section 38–2–6 bars the use of public records obtained under the Act to solicit for a commercial purpose. This is exactly what the Association intends to do. The Attorney General has been careful not to concede that section 38–2–6 is unconstitutional, and he has told at least one state agency (Rhode Island College) that it will be enforced. Against this backdrop, the Attorney General must proffer more than a conclusory assertion of inapplicability to convince us that the Association no longer faces a credible threat of prosecution. *See Abbott Labs.*, 387 U.S. at 154, 87 S.Ct. 1507 (rejecting Justice Department's conclusory representation, made after commencement of suit, as insufficient to render action moot); *cf. Dombrowski v. Pfister*, 380 U.S. 479, 494, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) ("So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one.").

The Attorney General directs us to a line of cases that consider the authoritative interpretations of local officials in assessing facial overbreadth challenges. *See, e.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Ward v. Rock Against Racism*, 491 U.S. 781, 795–96, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Gooding v. Wilson*, 405 U.S. 518, 524–28, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). These cases provide him precious little comfort. The instant statute is unambiguous and, therefore, not readily susceptible to a narrowing construction. Moreover, the cautious phrasing of the Attorney General's statements (e.g., "does not appear") is a far cry from a flat commitment not to prosecute in this particular instance. *See Wilson v. Stocker*, 819 F.2d 943, 947 & n. 3 (10th Cir.1987) (finding a credible threat of prosecution notwithstanding the Attorney General's affidavit which stated that "he did not presently believe the [plaintiff's] proposed conduct ... was prohibited by the statute"). Nor can the Attorney General's litigation position be viewed as "authoritative," given his guarded language and his office's long-standing policy against issuing advisory opinions to private parties.[5]

Finally, and perhaps most telling, the Attorney General has not furnished any plausible explanation for the suggestion that the Association's planned enterprise somehow eludes the proscription contained in section 38–2–6. *Cf. Wulp v. Corcoran*, 454 F.2d 826, 830 (1st Cir.1972) (finding standing where the plaintiffs' "challenge involve[d] facial unconstitutionality without the possibility of a limiting construction that would allow the core of the ordinance

---

5. The Assistant Attorney General's representation at oral argument that the state has "no intention of ever enforcing this law or defending its constitutionality" is too little, too late. *See Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan*, 77 F.3d 48, 51 & n. 4 (2d Cir.1996) (refusing to declare a controversy nonjusticiable on the basis of a representation at oral argument that was inconsistent with the party's brief). Throughout this litigation and in his brief to this court, the Attorney General maintained that the Association's proposed activity did not appear to fall within section 38–2–6's prohibitive scope, a position which inevitably implies the existence of other applications.

to be upheld as constitutional"). For this reason, the representations furnish no guidance for applying the statute to future cases. Even were these representations unequivocal (and they are not), to allow the government to render a pre-enforcement challenge to an unambiguous state statute moot simply by declaring a case-specific amnesty would effectively insulate unconstitutional state statutes from pre-enforcement review. This is simply not the law.[6] *See Plain Dealer Pub.*, 486 U.S. at 770 n. 11, 108 S.Ct. 2138.

A good illustration of how these principles ought to work can be found in *North Carolina Right to Life*, 168 F.3d 705. There, the plaintiffs brought a pre-enforcement challenge against a statute that on its face constrained the planned distribution of voter guides. *See id.* at 710. In 25 years, the statutory provisions had never been interpreted to cover issue advocacy of this kind. *See id.* Consistent with this understanding, the state defendants, including the attorney general, took the position that the challenged sections did not apply to issue advocacy. *See id.* The Fourth Circuit nonetheless found a justiciable controversy because "the only thing standing in the way of a criminal prosecution is the State's litigation position that it will voluntarily refrain from enforcing the statute according to its plain language." *Id.* at 711. This reasoning is equally applicable to the case at bar.

Let us be perfectly clear. Even when state officials fail to offer an authoritative interpretation of a state statute, a federal court considering a pre-enforcement challenge sometimes will presume a narrowing construction to which the law is fairly susceptible. *See Plain Dealer Pub.*, 486 U.S. at 770 n. 11, 108 S.Ct. 2138. In this case, however, we discern no plausible narrowing construction—and the Attorney General has pointed to none. Because construing the statute to exempt the Association's planned activity requires discarding wholesale the prohibition on commercial solicitation, the only practical way for the Attorney General to assuage a reasonable fear of prosecution would be to disclaim, in categorical terms, any intent to enforce the prohibition on commercial solicitation. *See Navegar, Inc. v. United States*, 103 F.3d 994, 1000 (D.C.Cir.1997) ("Because it is clear to whom these provisions of the Act would be applied were they to be applied at all, the imminent threat of such prosecutions can be deemed speculative only if it is likely that the government may simply decline to enforce these provisions at all."); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1502 (10th Cir.1995) (permitting case to proceed because state had "not affirmatively disavowed any intention of bringing criminal prosecution" under the challenged statute); *see also Hallandale Prof. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir.1991) (finding a justiciable controversy when "[a]ll that remained between the plaintiff and the impending harm was the defendant's discretionary decision—which could be changed—to withhold prosecution").

### D. *State Action.*

▇▇▇ We turn now to the Attorney General's last argument. His premise—that a

---

**6.** This same constellation of factors serves to distinguish *Richmond Med. Ctr. for Women v. Gilmore*, 144 F.3d 326 (4th Cir.1998), in which a single circuit judge vacated an injunction against enforcement of a "partial birth abortion" ban, reasoning that even if the statute could be interpreted to prohibit activities engaged in by the plaintiff physicians, the "unequivocal assurances" of the governor and attorney general alleviated any reasonable fear of prosecution. *Id.* at 330–31. To summarize, the representations here, unlike in *Richmond,* are far from unequivocal; this court, unlike the *Richmond* court, is not faced with the government's narrowing construction of a vague statute; and, finally, whereas the governor's narrowing construction provided a meaningful interpretation of the challenged Virginia statute, the two Rhode Island Attorneys General have offered only an unexplained conclusion that the Association's planned activity does not appear to offend section 38–2–6.

section 1983 suit necessitates a showing of state action—is sound. After all, the public/private dichotomy which distinguishes between state action and private conduct remains a staple of our constitutional jurisprudence. *See Perkins v. Londonderry Basketball Club,* 196 F.3d 13 (1st Cir. 1999). Consequently, state action is an indispensable ingredient of a suit which (like this one) raises a section 1983 claim predicated on an abridgement of First Amendment rights. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Rodríguez–García v. Dávila,* 904 F.2d 90, 94 (1st Cir.1990).

Citing *Tulsa Prof. Collection Servs. v. Pope,* 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988), the Attorney General argues that the scenario presented here encompasses insufficient state action to support a section 1983 claim. This argument fails.

In *Tulsa Prof.,* the Court held that the operation of a two-month limitation period for the presentation of contract claims in probate proceedings embodies state action. *See id.* at 488, 108 S.Ct. 1340. The Justices said that the involvement of the probate court throughout the process distinguished this nonclaim statute from self-executing statutes of limitations, the enactment and running of which do not implicate state action. *See id.* at 486–87, 108 S.Ct. 1340. In the Attorney General's view, section 38–2–6 is more akin to a self-executing statute of limitations than to a probate nonclaim statute (and, thus, does not involve state action). We disagree.

 A substantive criminal provision carries a threat of state action quite unlike a limitation period. Section 38–2–6 is such a law; it prohibits conduct and bears criminal sanctions. The penalties attending a violation of section 38–2–6 obviously depend on the state mounting a prosecution, so the provision cannot be described as "self-executing." Furthermore, the Association challenges not the mere enactment of section 38–2–6, but the combination of the section's proscriptive language and the

credible threat that the state will enforce it. Consequently, there is ample state action to support the use of 42 U.S.C. § 1983 as a vehicle for the Association's challenge. *See, e.g., Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (stating that an alleged constitutional deprivation caused "by a rule of conduct imposed by the State" can satisfy the state action requirement).

## III. CONCLUSION

We need go no further. At the moment of this action's conception, the Association had standing to challenge the commercial solicitation provision of R.I. Gen. Laws § 38–2–6, and it properly employed 42 U.S.C. § 1983 as a means to that end. The Association's claim was ripe then and is not moot now. Accordingly, we reject the Attorney General's plea of nonjusticiability and affirm the judgment below.

*Affirmed.*