**COMMUNITY HOUSING OF MAINE and John Doe, Plaintiffs**

v.

**Mel MARTINEZ, Secretary, United States Department of Housing & Urban Development and United States Department of Housing & Urban Development, Defendants**

**No. CIV 99–381–P–H.**

United States District Court, D. Maine.

May 14, 2001.

Robert M. Hayes, Moon, Moss, McGill & Bachelder, P.A., Portland, ME, for Community Housing of Maine, John Doe, plaintiffs.

David R. Collins, Halsey B. Frank, Office of the U.S. Attorney, Portland, ME, for Housing & Urban Development, U.S. Dept. of, Secretary, U.S. Dept. of Housing and Urban Development, defendants.

## MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR DECLARATORY JUDGMENT

HORNBY, Chief Judge.

This is a dispute over whether the United States Department of Housing & Urban Development ("HUD") permits HOME[1] program funds to be used for housing children who are "wards of the state," and if not, whether that prohibition is illegal under the HOME Investment Partnerships Act, 42 U.S.C.A. § 12721 *et seq.* (1995 & West Supp.2000). The plaintiffs are Community Housing of Maine ("Community Housing"), a nonprofit corporation that develops housing for people with disabilities, including wards of the state; and John Doe, an eight-year-old ward of the state. In a previous Order, I provisionally denied both the defendants' motion to dismiss and the plaintiffs' motion for declaratory judgment because I could not determine what HUD's policy was. *Community Hous. of Me. v. Martinez*, Civ. No. 99–381–P–H, 2001 WL 114979, *1 (D.Me. Feb. 8, 2001).[2] Since then, HUD has made clear that juvenile wards of the state are not automatically disqualified and that earlier statements it made to the contrary were wrong. Nevertheless, HUD resists any declaratory relief to that effect, primarily on grounds of standing, mootness, joinder and ripeness. I conclude that Community Housing has standing, that its claim is not moot, that its claim is ripe and that it is entitled to declaratory relief. The claim of the plaintiff John Doe, on the other hand, is MOOT.

## I. FACTS[3]

In May of 1999, HUD issued a policy newsletter that stated in no uncertain

---

**1.** HOME is shorthand for "Home Investment Partnerships." Common HUD Terms and Acronyms, *http://www.hud.gov/acronyms.cfm* (content last updated Feb. 16, 2001).

**2.** In retrospect, I recognize that the wording of the Order could have been more explicitly provisional, but the lawyers and I understood that the ruling was not and, in the circumstances of the case, could not be a final ruling.

**3.** I draw the facts from the administrative record that HUD filed in this Court on October 20, 2000; an undated letter from HUD's deputy general counsel that HUD filed in this Court on November 13, 2000; statements of facts submitted by both parties; and the testimony of Mary Kolesar, the HUD official re-

sponsible for the HOME program, offered at a hearing I held to clarify the record on March 20, 2001. At the hearing HUD objected to the taking of testimony in this Administrative Procedures Act case. I overruled the objection because Kolesar's testimony served to clarify the existing administrative record and supplement it to substantiate and explain the change in HUD's position—articulated in a letter authored by HUD's deputy general counsel, discussed below—that evidently occurred after the record was prepared. While the letter was not filed as part of the formal administrative record, HUD submitted it voluntarily and relied on it to support its motion to dismiss and to defend against plaintiffs' motion for declaratory judgment. *See* Defs.' Mot. to Dismiss Incorporating a Mem. of Law at 6; Defs.' Reply in Supp. of its Mot. to Dismiss

terms that wards of the state were ineligible for HOME funds. Administrative Record ("Record") at 40–41 (*HOMEfires* newsletter, May 1999, at 1–2). HUD posted that newsletter on its website and faxed it to the Maine State Housing Authority ("MSHA"), the state agency that administers the HOME program for HUD in Maine. Test. of Mary Kolesar, Evidentiary Hr'g, March 20, 2001, Tr. at 24–25. HUD issued the newsletter in response to questions that participating jurisdictions (the state and local governments who receive allocations of HOME funds) had asked in the preceding months.[4] Record at 40 (*HOMEfires* newsletter, May 1999, at 1); Tr. at 23. MSHA thereafter refused to release HOME funds for Community Housing's Turning Point Farm, stating that HOME funds could not be used for wards of the state. Record at 34 (David Beseda Aff. ¶ 19). After attempts to resolve the Turning Point Farm issue with HUD through informal channels failed, Community Housing filed its original complaint challenging the HUD policy

on December 22, 1999. Record at 65–66 (James O'Keefe Aff. ¶¶ 2–5); Record at 67–68. Then–HUD Secretary Andrew Cuomo swiftly intervened in an attempt to settle the case. As a result, HUD allowed HOME funds to be used for Turning Point Farm by waiving the requirement that it meet the regulatory definition of "housing" (the waiver did not address the fact that the project was for wards of the state). Record at 1–2; Pls.' Statement of Facts ¶ 9. The waiver resolved the immediate problem of funding for Turning Point Farm but did not address the underlying issue that Community Housing soon found itself again confronting. In May, 2000, MSHA informed Community Housing that its Circle of Friends project was ineligible for HOME funds because it, too, was for wards of the state. Defs.' Statement of Facts ¶ 23; Pls.' Statement of Facts ¶ 19. The plaintiffs filed an amended complaint on May 17, 2000, substituting allegations relating to the Circle of Friends project for the previous allegations relating to the Turning Point Farm project.

and Opp'n to Pls.' Mot. for Decl. J. at 2, 10. Accordingly, I treat it as though it is part of the record, and Kolesar's testimony was appropriate to explain HUD's apparently contradictory positions. *See Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (stating that where an agency fails to explain its actions so as to frustrate effective judicial review the remedy is to obtain additional explanation through affidavits or testimony but cautioning that even a curt explanation is enough to permit judicial review); *Sierra Club v. Marsh*, 976 F.2d 763, 772 (1st Cir.1992) (stating that new evidence is permissible to explain a decisionmaker's action at the time it occurred, but not to offer new rationalizations). HUD's litigation strategy otherwise made it impossible to conclude with confidence what position the agency actually took. The statements of fact? which bear upon standing, ripeness, mootness and joinder?are somewhat more problematic. At one point the parties reported that they should be able to stipulate, then reported that they could not, at some points expressed a

desire for discovery or restrictions to discovery, and at another point that although they could not stipulate they would not contest each other's statement. Ultimately, they expressed no further desire to enlarge the record and I take their statements of fact (as distinguished from conclusory assertions) at face value on the preliminary issues of standing, ripeness, mootness and joinder.

4. MSHA was among the participating jurisdictions that had raised the question, and prior to the *HOMEfires* newsletter HUD had instructed it, through an e-mail message authored by then-HUD employee David Leopold and dated March 24, 1999, that projects benefiting wards of the state were ineligible for HOME funds. Record at 42. Mary Kolesar, the HUD official responsible for the program whose testimony regarding the policy is outlined below, was copied on the Leopold e-mail. Record at 42; Tr. at 27. She testified that the Leopold e-mail correctly stated HUD's policy at the time it was sent. Tr. at 28.

On November 13, 2000, HUD's deputy general counsel filed with this court an undated letter stating that the fact that a housing project is for wards of the states "has no effect on the eligibility of the housing to receive HOME funds." Undated letter from Kevin M. Simpson, HUD Deputy General Counsel, to Linda Sears, MSHA General Counsel filed Nov. 13, 2000. But HUD refused to confirm that the letter was indeed an authoritative statement of HUD's policy, or to communicate that policy to responsible federal and state officials around the country. *Community Hous. of Me. v. Martinez*, Civ. No. 99–381–P–H, 2001 WL 114979 *1 (D.Me. Feb. 8, 2001) (stating that the plaintiffs' lawyer had asserted to this Court and HUD's attorney that it would dismiss the case if HUD affirmed that the position taken in the letter was authoritative and communicated it in good faith to participating jurisdictions, but that HUD had apparently declined to do so).

To resolve the continuing uncertainty over what HUD's policy really was, I ordered HUD to produce someone to testify as to whether the deputy general counsel's letter reflected HUD's current policy. *Community Hous. of Me. v. Martinez*, Civ. No. 99–381–P–H, 2001 WL 114979 *1 (D.Me. Feb. 8, 2001). HUD produced Mary Kolesar, the Director of the Office of Affordable Housing Programs within HUD's Office of Community Planning and Development, who is the HUD official responsible for the HOME program. Tr. at 14–15. She testified that she had authority from her superiors and HUD Secretary Mel Martinez to state HUD's current policy. Tr. at 34. She testified unequivocally that, under current policy, the fact that a housing project is for wards of the state is no longer a factor in determining its eligibility for HOME funds. Tr. at 18, 34–35. She also testified that HUD did previously have a policy of excluding wards of the state from the HOME program, Tr. at 20–21, 23, that the *HOMEfires* newsletter articulating that policy has now been withdrawn from HUD's website, Tr. at 21, but that she could not pinpoint when HUD reversed itself. Tr. at 41.

After Kolesar's testimony, the plaintiffs renewed their request for declaratory judgment and the defendants renewed their resistance on jurisdictional and procedural grounds. Neither party has requested any further enlargement of the record. With HUD's position now clarified, I make my final judgment.

## II. DISCUSSION

### A. STANDING

█ HUD has argued from the outset that neither Community Housing nor John Doe has standing. Defs.' Mot. to Dismiss at 10–11. To have standing, a plaintiff must demonstrate three things. First, at the time the complaint is filed, the plaintiff must have suffered an injury to a legally protected interest. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). That injury must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotation marks omitted). Second, the plaintiff must demonstrate "a causal connection between the injury and the conduct complained of." That is, the injury must be " 'fairly traceable' " to the defendant's actions, and not to the independent action of some third party. *Id.* at 560–61, 112 S.Ct. 2130 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (quot-

ing *Simon,* 426 U.S. at 38, 43, 96 S.Ct. 1917).

Community Housing meets all three requirements. First, Community Housing's Circle of Friends project was derailed, Pls.' Statement of Facts at ¶¶ 17–19; Defs.' Statement of Facts ¶¶ 21–26, and Community Housing has not developed other projects because its limited resources do not allow it to incur development expenses unless it is fairly certain of a project's viability. Pls.' Statement of Facts ¶ 11–16. Second, HUD's argument that MSHA, not HUD, caused the demise of the Circle of Friends project is unconvincing. In disqualifying projects benefiting wards of the state, MSHA was merely carrying out HUD's orders, not making an independent decision.[5] Community Housing's injury is therefore "fairly traceable" to HUD. Third, the declaratory relief that Community Housing seeks would redress Community Housing's injury by removing the doubt HUD's policy has cast on the viability of projects that Community Housing would otherwise develop, thereby allowing it to proceed with its mission.[6] Community Housing therefore has standing. I do not consider John Doe's standing because, as discussed below, I conclude that even if he did have standing when the amended complaint was filed, his claim is moot.

### B. MOOTNESS

■ The Supreme Court recently reaffirmed the general rule that voluntarily ending a challenged practice after a case is filed does not make the case moot. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The rule prevents a defendant from evading judgment on the merits of a case by temporarily stopping the challenged practice, only to be " 'free to return to his old ways' " after dismissal. *Id.* (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). A defendant can moot a case through voluntary change only if it carries the "heavy burden" of persuading the court that it is " 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Friends of the Earth,* 528 U.S. at 189, 120 S.Ct. 693 (quoting *United States v. Concentrated Phosphate Exp. Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)).

### (1) Community Housing

■ In this case, HUD has offered no assurance that it would not reinstate the challenged policy if I were to dismiss the case as moot. Nor am I aware of any legal or practical constraints that would stop HUD from returning to its old ways. To the contrary, HUD abandoned the challenged policy through a swift, informal, and opaque process, and I have no reason to believe that it could not easily reinstate the policy in the same way. If it were to do so, Community Housing would again

---

5. In the initial stages of the lawsuit, when Turning Point Farm was the project at stake, an affidavit of Linda Sears, Chief Counsel to MSHA, confirmed that MSHA did not release HOME funds for the Turning Point Farm project because of communications from HUD; that MSHA would release the funds if HUD withdrew "its prohibition"; and that Sears found no support for HUD's position in the pertinent statute and regulations. Record at 69 (Linda Sears Aff. ¶¶ 2–4). Nothing in the record suggests that MSHA changed its position in rejecting the Circle of Friends project.

6. HUD asserts that HOME funds may continue to be unavailable for some Community Housing projects because HUD maintains that certain projects are not "housing" as that term is defined in the applicable regulations. That issue, however, is not before me in this case.

face the injuries discussed above. Thus, HUD has not satisfied its heavy burden, and Community Housing's claims are not moot.

**(2) John Doe**

■ The amended complaint reveals nothing about John Doe other than that, at the time it was filed, he was a seven-year-old child in the custody of the Maine Department of Human Services; that he was residing in an out-of-state hospital for lack of appropriate foster care placement; and that he was an "intended beneficiary of housing developed and managed by Community Housing." Am. Compl. ¶¶ 2, 8. After the amended complaint was filed, John Doe moved into Turning Point Farm, the project that had been the subject of the original complaint. Defs.' Statement of Facts ¶ 18. But before the amended complaint was filed, HUD had agreed to release HOME funds for the Turning Point Farm (through the March 8, 2000, waiver). The record is silent as to whether John Doe had a secure place at Turning Point Farm once HUD issued the waiver. If he did, then he did not have standing when he filed the amended complaint. But even if he did not have a secure place at Turning Point Farm when the amended complaint was filed, his claim became moot when he was placed there because that *placement* was not the result of HUD's voluntary compliance. HUD had previously agreed to fund Turning Point Farm, and there is no indication in the record that HUD determines who resides at particular HOME-funded housing projects. John Doe's injury has abated, but not because of HUD's voluntary compliance. His claim is therefore moot.

**(C) RIPENESS**

The plaintiffs argue that HUD's previous policy of excluding wards of the state from eligibility for HOME funds is ripe for judicial review because it was final agency action. HUD rejects the characterization of the policy as final agency action; it argues that the only final agency actions are the Turning Point Farm waiver and the letter from HUD's deputy general counsel disclaiming the challenged policy. HUD also argues that judicial review would disrupt HUD's administrative processes.

■ The function of the ripeness doctrine is " 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *Stern v. United States Dist. Ct. for the Dist. of Mass.*, 214 F.3d 4, 10 (1st Cir.2000) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); see also *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir.1999). Ripeness turns on the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (internal quotation marks omitted); see also *R.I. Ass'n*, 199 F.3d at 33; *W.R. Grace & Co. v. United States Envtl. Prot. Agency*, 959 F.2d 360, 364 (1st Cir. 1992).

**(1) Fitness for Judicial Review**

■ At its most basic level, fitness depends on " 'whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all.' " *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir.1995) (quoting *Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir.1992)). This " 'typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge

depends on facts that may not yet be sufficiently developed.'" *Stern,* 214 F.3d at 10 (quoting *Ernst & Young,* 45 F.3d at 535). In a case like this, fitness depends more specifically on "whether the issue presented is purely legal, as opposed to factual, and the degree to which any challenged agency action is final." *W.R. Grace & Co.,* 959 F.2d at 364.

 HUD argues that the *HOMEfires* newsletter did not constitute final agency action. Generally, agency action is final if (1) it marks the "consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) it is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks and citations omitted). Finality is determined in a pragmatic and flexible way, *Abbott Labs.,* 387 U.S. at 149–151, 87 S.Ct. 1507, and even the relatively informal actions of subordinate officials can be final if the two conditions are satisfied. *See Natural Res. Def. Council, Inc. v. Thomas,* 845 F.2d 1088, 1094 (D.C.Cir.1988) (finding final agency action in memorandum authored by a subordinate agency official who was the director of the relevant program, where no further action by the agency head was directly implicated, no further proceedings were noticed, and where cooperating state agencies would have been justified in construing the memorandum as "their marching orders"—but nonetheless holding claims unripe for review on prudential grounds).

In this case, the administrative record indicates that the May 1999 *HOMEfires* policy newsletter was the consummation of a decisionmaking process that began months earlier. There is no indication, either in the newsletter itself or elsewhere in the administrative record, that the policy was tentative or in any way subject to further review or reconsideration. HUD's argument that the policy could not have been final agency action because it subsequently took further action—the Turning Point Farm waiver and the letter from its general counsel—is unconvincing. From all that appears, HUD only took those actions in attempts to settle this case. There is no indication that the plaintiffs could have provoked them without filing suit, and HUD therefore cannot rely on them to show that the case was filed prematurely.

HUD also argues that because the policy has been retracted it is not an action by which rights or obligations have been determined, or from which legal consequences will flow. That argument conflates ripeness and mootness. In doing so it misses the real ripeness issue, which is whether rights or obligations had been determined or legal consequences had flowed at the time the amended complaint was filed, when the policy was in force. *See R.I. Ass'n,* 199 F.3d at 33–34 (concluding that the plaintiff's claims were "ripe when filed"). The HOMEfires newsletter instructed that

> [p]articipating jurisdictions must ensure that any beneficiaries of HOME funding for transitional housing meet the requirements for being eligible to reside in transitional housing. Participating jurisdictions must look at the legal responsibilities of the State ... to determine whether ... wards are eligible HOME beneficiaries.
>
> *Wards of the State are not eligible beneficiaries ... [if] the State has the responsibility of providing for their needs.*

Record at 40 (emphasis added). That language gave participating jurisdictions, including MSHA, their "marching orders,"

and HUD expected them to "fall in line." *Appalachian Power Co. v. United States Envtl. Prot. Agency,* 208 F.3d 1015, 1023 (D.C.Cir.2000) (finding that an EPA guidance document created obligations on the part of state regulators and those they regulate where the guidance "read[ ] like a ukase"); *Natural Res. Def. Council,* 845 F.2d at 1094. In effect, the newsletter obliged MSHA to exclude projects benefiting wards of the state from eligibility for HOME funding, with legal consequence flowing to Community Housing. Accordingly, I conclude that HUD's articulation of the policy of excluding wards of the state in the May 1999 *HOMEfires* newsletter constituted final agency action.[7]

### (2) The Hardship of Withholding Judicial Review

■ Hardship is most easily shown by direct and immediate harm, but "other kinds of injuries occasionally may suffice," and "in special circumstances, an injury sufficient to impute ripeness may also be found when a plaintiff must presently decide to expend substantial resources which may turn out to be wasted, depending on later clarification of the law." *Ernst & Young,* 45 F.3d at 536 (discussing *Pac. Gas. & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n,* 461 U.S. 190, 201–02, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), in which plaintiff utilities were faced with decision whether to expend millions of dollars developing a nuclear power plant). *See also Stern,* 214 F.3d at 10.

■ In this case, as discussed under the standing heading above,[8] Community Housing has been injured by HUD's policy, both by the rejection of its Circle of Friends Project and by hindering its development of other housing projects. Those injuries are direct and immediate, and withholding review would impose a substantial hardship by allowing them to continue. Community Housing's claim for declaratory relief is therefore ripe.

### (D) Indispensable Party

■ Community Housing's challenge in this lawsuit is against a HUD policy. HUD nonetheless argues that MSHA is an indispensable party, as either a plaintiff or a defendant. Defs.' Mot. to Dismiss at 13. HUD's first argument rests on Federal Rule of Civil Procedure 19(a)(2)(i), which provides that a person "shall be joined as a party in the action if … (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest." Fed.R.Civ.P. 19(a)(2)(i). Whatever "pecuniary and institutional interest" MSHA may have in this action, Def. Mot. to Dismiss at 12, the record indicates that MSHA supports Community Housing's position. Record at 69 (Linda Sears Affidavit ¶¶ 3–4). As such, and given Community Housing's vigorous prosecution of this action, I cannot see how MSHA's absence impairs or impedes its interest. That argument fails.

HUD's second argument rests on Rule 19(a)(1). It provides that a person shall be joined if in that person's absence "complete relief cannot be accorded among those already parties." Fed.R.Civ.P.

---

7. HUD also argues that the plaintiffs' claims are not ripe for judicial review because HUD never made any decision regarding Community Housing's Circle of Friends project—that MSHA rejected the project without consulting HUD. That argument fails to recognize that

the relevant agency action was HUD's then-existing policy statement.

8. The First Circuit has noted that "standing and ripeness may substantially overlap." *R.I. Ass'n,* 199 F.3d at 33.

19(a)(1). This argument fails because the only way MSHA's absence would prevent Community Housing from obtaining complete relief would be if MSHA were to continue to refuse to allow HOME funds to be used for Community Housing projects benefiting wards of the state, in disregard of a(now) contrary HUD policy and this Order. But MSHA has stated that it would release HOME funds to Community Housing projects for wards of the state if HUD would withdraw its prohibition and that MSHA supports Community Housing's position. Moreover, I have no reason to believe, nor will I presume, that MSHA would administer HOME funds in any manner other than in accord with a clearly articulated HUD policy.[9] Therefore, Community Housing can obtain the "complete relief" it seeks without joining MSHA.

### III. RELIEF

With the jurisdictional and procedural issues resolved, I proceed to the substantive merits of Community Housing's claim for declaratory judgment. My analysis here is abbreviated by HUD's failure, despite several opportunities (at conferences, hearings, and in response to the plaintiffs' motion for declaratory judgment), to defend the lawfulness of the policy that housing for wards of the state is ineligible to receive HOME funds. Instead, HUD has admitted that the policy resulted from unspecified confusion or misunderstanding, Reply in Supp. of Def.'s Mot. to Dismiss & Opp'n to Pl.'s Mot. for Decl. J. at 2, 13, and it has stated and authoritatively confirmed that it no longer maintains the policy. Undated letter from Kevin M. Simpson, HUD Deputy General Counsel, to Linda Sears,

MSHA General Counsel, filed Nov. 13, 2000; Tr. at 34–35. Its defense in this lawsuit instead has focused on the jurisdictional and procedural arguments discussed above. I am left with an abiding sense that HUD simply does not believe that the challenged policy is lawful, and I conclude that HUD has conceded as much by failing to argue otherwise.

Accordingly, the defendants' motion to dismiss is GRANTED as to John Doe and DENIED as to Community Housing. Community Housing's motion for declaratory judgment is GRANTED as follows: It is hereby ADJUDGED that under the HOME Investment Partnerships Act, 42 U.S.C. § 12721 *et seq.* (1995 & West Supp.2000), HUD may not consider the status of residents as wards of the state as a disqualifying factor in determining whether housing projects are eligible to receive HOME funds.

SO ORDERED.

---

**9.** MSHA's initial award of HOME funds to the Turning Point Farm project was not in accord with the policy HUD articulated in the May *HOMEfires* newsletter, but MSHA corrected that mistake without any prompting from HUD by refusing to release the awarded funds. So far as I can discern, MSHA's conduct in the events related to this litigation indicates nothing but a conscientious effort to comply with HUD policy. *See, e.g.,* Record at 69 (Linda Sears Affidavit ¶¶ 2, 4).