# United States Court of Appeals
## For the First Circuit

No. 19-1835

NEW HAMPSHIRE LOTTERY COMMISSION;
NEOPOLLARD INTERACTIVE LLC; POLLARD BANKNOTE LIMITED,

Plaintiffs, Appellees,

v.

JEFFREY ROSEN, Acting U.S. Attorney General;*
UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch and Kayatta,
Circuit Judges.**

Jeffrey E. Sandberg, Attorney, Appellate Staff, Civil
Division, U.S. Department of Justice, with whom Ethan P. Davis,
Principal Deputy Assistant Attorney General, Hashim M. Mooppan,
Deputy Assistant Attorney General, and Scott R. McIntosh,

---

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Acting Attorney General Jeffrey Rosen has been substituted for
former Attorney General William P. Barr.

\*\* Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion in this case. The remaining two
panelists therefore issued the opinion pursuant to 28 U.S.C.
§ 46(d).

Attorney, Appellate Staff, Civil Division, were on brief, for appellants.

Anthony J. Galdieri, Senior Assistant Attorney General, Civil Bureau, with whom Gordon J. MacDonald, Attorney General, was on brief, for appellee New Hampshire Lottery Commission.

Matthew D. McGill, with whom Theodore B. Olson, Lochlan F. Shelfer, Joshua M. Wesneski, Debra Wong Yang, and Gibson, Dunn & Crutcher LLP were on brief, for appellees NeoPollard Interactive LLC and Pollard Banknote Limited.

Charles J. Cooper, David H. Thompson, Brian W. Barnes, J. Joel Alicea, Nicole Frazer Reaves, and Cooper & Kirk, PLLC on brief for Coalition to Stop Internet Gambling and National Association of Convenience Stores, amici curiae.

Jonathan F. Cohn, Peter D. Keisler, Joshua J. Fougere, Daniel J. Hay, Derek A. Webb, and Sidley Austin LLP on brief for International Game Technology PLC, amicus curiae.

A. Jeff Ifrah, Andrew J. Silver, and Ifrah PLLC on brief for iDevelopment and Economic Association, amicus curiae.

Kevin F. King, Rafael Reyneri, and Covington & Burling LLP, on brief for Association of Gaming Equipment Manufacturers, amicus curiae.

A. Michael Pratt, Elliot H. Scherker, Nicole Leonard Cordoba, Greenberg Traurig, LLP and Greenberg Traurig, P.A. on brief for The Commonwealth of Pennsylvania, amicus curiae.

Glenn J. Moramarco, Assistant Attorney General, John T. Passante, Deputy Attorney General, and Gurbir S. Grewal, Attorney General of New Jersey, on brief for the State of New Jersey, amicus curiae.

Dana Nessel, Michigan Attorney General, Fadwa A. Hammoud, Solicitor General, Melinda A. Leonard, Mark G. Sands, Donald S. McGehee, Assistant Attorneys General, Jason Ravnsborg, Attorney General, State of South Dakota, Dave Yost, Attorney General, State of Ohio, Kathleen Jennings, Attorney General, State of Delaware, Joshua H. Stein, Attorney General, State of North Carolina, Mark R. Herring, Attorney General of Virginia, T.J. Donovan, Attorney General, State of Vermont, Kevin G. Clarkson, Attorney General, State of Alaska, Josh Kaul, Attorney General, State of Wisconsin, Mary R. Harville, Senior Vice President, General Counsel & Corporate Secretary, Kentucky Lottery Corporation, Phil Weiser, Attorney General, State of Colorado, Keith Ellison, Attorney General, State of Minnesota, Lawrence G. Wasden, Attorney General of Idaho, Valerie Morozov, Legal Counsel, Rhode Island Dept. of Revenue, Division of Lottery, William Tong, Attorney General of Connecticut, Karl A. Racine, Attorney General for the District of Columbia, Brian E. Frosh, Attorney General of Maryland, Alonda W. McCutcheon, General Counsel, Tennessee Education Lottery Corporation, on brief for the State of Michigan, Michigan Bureau

of State Lottery, and South Dakota, Ohio, Delaware, North Carolina, Virginia, Vermont, Alaska, Wisconsin, Colorado, Minnesota, Idaho, Connecticut, District of Columbia, Maryland, the Rhode Island Department of Revenue, Division of Lottery, the Kentucky Lottery Corporation, and the Tennessee Education Lottery Corporation, amici curiae.

January 20, 2021

**KAYATTA**, **Circuit Judge**.  In 2018, the Office of Legal Counsel ("OLC") of the U.S. Department of Justice ("DOJ") issued a legal opinion, adopted by DOJ, that all prohibitions in the Wire Act of 1961, save one, apply to all forms of bets or wagers (the "2018 Opinion").  The 2018 Opinion superseded an OLC opinion from 2011 concluding that the Wire Act's prohibitions were uniformly limited to sports gambling (the "2011 Opinion").  Suffice it to say, the more expansive construction of the Wire Act adopted in 2018 caused great consternation among the many states and their vendors who, as the 2018 Opinion acknowledged, had "beg[u]n selling lottery tickets via the Internet after the issuance of [the] 2011 Opinion."  Not eager to scrap or shrink its lottery, the New Hampshire Lottery Commission and one of its vendors, NeoPollard,[1] commenced this action in February 2019, seeking relief under the Declaratory Judgment Act and the Administrative Procedure Act. The district court granted both requests, ruling that the Wire Act is limited to sports gambling, as OLC initially opined.

The Attorney General, DOJ, and the United States (collectively "the government") appealed the district court's judgment.  For the following reasons, we hold that the controversy

---

[1]  We refer to both Plaintiffs NeoPollard Interactive LLC and its fifty-percent owner, Pollard Banknote Limited, collectively as "NeoPollard."

before us is justiciable and that the Wire Act's prohibitions are limited to bets or wagers on sporting events or contests. We depart from the district court only by deciding that relief under the Declaratory Judgment Act alone is sufficient.

**I.**

**A.**

In 1961, Congress passed the Wire Act. See 18 U.S.C. § 1084 (codifying Pub. L. No. 87-216, § 2, 75 Stat. 491, 491 (1961)). The subsection relevant for our purposes, section 1084(a), reads:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

The question the parties present to us is whether the phrase "on any sporting event or contest" (the "sports-gambling qualifier") qualifies the term "bets or wagers" as used throughout section 1084(a).

Although Congress enacted the Wire Act in 1961, this question seems not to have raised its head until after a

substantial amount of commerce had moved to the internet four decades later. In 2002, the Fifth Circuit opined in a private civil suit that "[a] plain reading of the statutory language [of the Wire Act] clearly requires that the object of the gambling be a sporting event or contest." In re MasterCard Int'l Inc., 313 F.3d 257, 262 n.20 (5th Cir. 2002) (second alteration in original) (quoting In re MasterCard Int'l Inc., Internet Gambling Litig., 132 F. Supp. 2d 468, 480 (E.D. La. 2001)). In May 2005, the Deputy Assistant Attorney General of DOJ's Criminal Division begged to differ, issuing a letter to inform the Illinois Lottery Superintendent that DOJ believed that prospective legislation pending in the Illinois Senate to create a website where people could purchase lottery tickets over the internet would violate section 1084. DOJ explained its view that, although the purchase of lottery tickets might be lawful in Illinois, "the acceptance of wagers through the use of a wire communication facility by a gambling business, including [one] operated by . . . a state, from individuals located . . . within the borders of the state (but where transmission is routed outside of the state) would violate federal law." The letter equated the sale of lottery tickets with the acceptance of wagers and deemed the interstate transmission of such wagers violative of the Wire Act regardless of whether they were placed on sporting events or contests.

Four years later, in December 2009, authorities from New York and Illinois requested the views of DOJ's Criminal Division on the legality of the states' plans to use the internet and out-of-state transaction processing systems to sell lottery tickets to adults within their states. The states pointed out that their proposals had been designed to comport with the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361-5367, and argued that the Wire Act did not bar their proposed systems because section 1084(a) was limited to sports-related gambling. In response, and in keeping with its 2005 letter to Illinois, the Criminal Division opined that section 1084(a) was not so limited and that the Act would prohibit the use of the internet to transmit bets or wagers of any kind, even if the transactions originated and ended within a single state. The Criminal Division nevertheless noted the tension that this reading of the statute created with the UIGEA, which explicitly excludes from its prohibition of "unlawful Internet gambling" the "placing, receiving, or otherwise transmitting a bet or wager where . . . the bet or wager is initiated and received or otherwise made exclusively within a single State," 31 U.S.C. § 5362(10)(B), despite "[t]he intermediate routing of electronic data" through other states, id. § 5362(10)(E). The Criminal Division noted the "potential oddity" whereby the Wire Act's reference to "the use of

interstate commerce" would criminalize otherwise lawful state-run, in-state lottery transactions.  For these reasons, the Criminal Division sought guidance from OLC on whether the use of the internet for in-state lottery sales with out-of-state processing violated the Wire Act.

In its 2011 Opinion, OLC agreed with the Fifth Circuit, concluding that "the Wire Act does not reach interstate transmissions of wire communications that do not relate to a 'sporting event or contest'" and ultimately concluded that the states' lottery-related proposals did not violate the Wire Act. See Whether the Wire Act Applies to Non-Sports Gambling, 35 Op. O.L.C. 134, 151 (2011) ("2011 Opinion").

So matters stood until 2017, when the Criminal Division asked OLC to reconsider its position, which OLC did in a formal opinion published in November 2018, superseding and replacing the 2011 Opinion.  See Reconsidering Whether the Wire Act Applies to Non-Sports Gambling, 42 Op. O.L.C. __, at *23, 2018 WL 7080165, at *14 (Nov. 2, 2018) ("2018 Opinion").[2]  In the 2018 Opinion, OLC

---

[2]  Unlike in the 2011 Opinion, the Criminal Division's reasons for requesting OLC's advice are not detailed in the 2018 OLC Opinion itself.  See 2018 Opinion at *1-2, 2018 WL 7080165, at *1. NeoPollard's complaint states that news sources had reported that OLC's 2018 Opinion came on the heels of lobbying efforts by the Coalition to Stop Internet Gambling, an organization participating as amicus curiae on behalf of the government in this case.  See Byron Tau & Alexandra Berzon, Justice Department's Reversal on

found the statutory language in section 1084(a) unambiguous and its prohibitions plainly not limited to sports gambling, save for the second prohibition contained in the first clause, which bars "us[ing] a wire communication facility for the transmission in interstate or foreign commerce of . . . information assisting in the placing of bets or wagers on any sporting event or contest." Id. at *2, *14, 2018 WL 7080165, at *1, *9 (quoting 18 U.S.C. § 1084(a)).[3] OLC justified its reversal on the grounds that the 2011 Opinion did not devote adequate attention to either the text of the statute or the canons of statutory construction, was "of relatively recent vintage," and departed from DOJ's former position. Id. at *21—22, 2018 WL 7080165, at *13. The 2018 Opinion noted that some reliance interests would be affected: "Some States, for example, began selling lottery tickets via the Internet after the issuance of our 2011 Opinion." Id. at *22, 2018 WL 7080165, at *14. But OLC concluded that "such reliance interests [we]re [in]sufficient to justify continued adherence to the 2011 opinion." Id. at *23, 2018 WL 7080165, at *14.

---

Online Gambling Tracked Memo from Adelson Lobbyists, Wall St. J. (Jan. 18, 2019), https://www.wsj.com/articles/justice-departments-reversal-on-online-gambling-tracked-memo-from-adelson-lobbyists-11547854137.

[3] The 2018 Opinion also found that the UIGEA, which Congress enacted in 2006, did not modify or otherwise alter section 1084(a). 2018 Opinion at *18, 2018 WL 7080165, at *12.

In a subsequently issued memorandum, the Deputy Attorney General instructed DOJ attorneys to "adhere to OLC's interpretation, which represents the Department's position on the meaning of the Wire Act." Rod Rosenstein, U.S. Dep't of Just., Applicability of the Wire Act, 18 U.S.C. § 1084, to Non-Sports Gambling (2019) ("January 2019 Memo"). Addressing the reliance interests, the memo stated:

> As an exercise of discretion, Department of Justice attorneys should refrain from applying Section 1084(a) in criminal or civil actions to persons who engaged in conduct violating the Wire Act in reliance on the 2011 OLC opinion prior to the date of this memorandum, and for 90 days thereafter. A 90-day window will give businesses that relied on the 2011 OLC opinion time to bring their operations into compliance with federal law. This is an internal exercise of prosecutorial discretion; it is not a safe harbor for violations of the Wire Act.

Id. DOJ subsequently extended the forbearance period several times, most recently until December 1, 2020.

After this lawsuit commenced, the Deputy Attorney General issued yet another memorandum, this time stating that the 2018 Opinion in fact "did not address whether the Wire Act applies to State lotteries and their vendors" but that DOJ was "now reviewing that question." Rod Rosenstein, U.S. Dep't of Just., Notice Regarding Applicability of the Wire Act, 18 U.S.C. § 1084, to State Lotteries and Their Vendors (2019) ("April 2019 Memo").

- 10 -

Accordingly, DOJ granted a separate ninety-day forbearance period specific to state lotteries and their vendors, which will begin when DOJ publicly announces its position on the applicability of the Wire Act to them.  DOJ has not yet made such an announcement.

**B.**

Government-run lotteries apparently harken at least as far back as colonial America, where the lottery "flourished as a substitute for conventional methods of public and private finance."  Nat'l Inst. of L. Enf't & Crim. Just., U.S. Dep't of Justice, The Development of the Law of Gambling: 1776–1976, at 660 (1977).  Forty-eight states or territories currently operate lotteries.  New Hampshire is among them.  Through its Lottery Commission ("NHLC"), it runs a traditional retailer-based lottery at 1,400 sites across the state.  Its business does not involve placing bets or wagers on sporting events or contests.  The NHLC's profits are earmarked for the state's Education Trust Fund.  See N.H. Const. pt. 2, art. 6-b; N.H. Rev. Stat. Ann. § 284:21-j.  In the 2018 fiscal year, the NHLC contributed $87.2 million to this fund.[4]  All of the NHLC's lottery-related activities use the

_____

[4]  Many other states, represented as amici in this case, rely on substantial profits earned from lotteries that operate like New Hampshire's.  The Michigan Bureau of State Lottery along with forty-six other government-operated lotteries collectively generated more than eighty billion dollars in gross revenues in 2017, which went to fund a myriad of state programs.

internet or interstate wires. For its brick-and-mortar operations, the state lottery relies on computer gaming and back-office systems that manage lottery inventory and sales, which in turn depend on out-of-state backup servers. Via its website and various social media platforms, the NHLC communicates draw results, advertises lottery games, and provides general information.

After OLC issued the 2011 Opinion, New Hampshire began operating its iLottery system, developed by NeoPollard. The system allows players to engage in various types of games online. Players pay for their wagers through an online account into which they can deposit funds only when they are within the state's borders. While the players themselves must be physically located in New Hampshire for the entirety of the transaction, intermediate routing of data or information ancillary to the transaction may cross state lines.

The iLottery system is projected to generate six to eight million dollars in revenue for New Hampshire in fiscal year 2021. The NHLC predicts sales would drop precipitously if it could not rely on the internet for its operations. It estimates its withdrawal from multi-jurisdictional games like "Powerball" alone would cost the state forty million dollars per year in education funding. Without further guidance from DOJ, the NHLC expects

banks to become unwilling to accept and process iLottery transactions.

For its part, NeoPollard has invested tens of millions of dollars into building its iLottery system, which it has also configured for deployment in Michigan and Virginia.[5] NeoPollard claims that "the only way to ensure full compliance with the interpretation of the Wire Act outlined in the . . . [2018 Opinion] is to suspend the entirety of its iLottery operations in New Hampshire, costing NeoPollard millions of dollars in investment-backed expectations and player goodwill." If it continues to operate iLottery in New Hampshire, "NeoPollard believes . . . it faces imminent prosecution."

## c.

On February 15, 2019, the NHLC filed its complaint against the government along with a motion for summary judgment. The NHLC requested a declaratory judgment that the Wire Act does not extend to state-conducted lottery activities, an order setting

---

[5] Other states, appearing before us as amici, have expanded their online platforms further, legalizing and licensing additional forms of online gambling. New Jersey, for example, has rolled out the online gambling platform, iGaming. New Jersey notes that from 2013 through 2016 the iGaming platform generated $998.3 million in sales and $124.4 million in tax revenue. Meanwhile, Pennsylvania represents that, because of the 2018 Opinion, it scaled back its online gaming infrastructure, leading to an estimated one billion dollars in lost revenue for the state.

aside the 2018 Opinion pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and injunctive relief. The NHLC advanced two basic arguments: (1) the prohibitions of section 1084(a) do not even apply to states; and (2) section 1084 is limited to sports gambling and thus does not extend to state-conducted lottery activity.

On the same day the NHLC filed suit, NeoPollard also filed a complaint and a concurrent motion for summary judgment. NeoPollard sought a judgment declaring that the Wire Act is limited to gambling on sporting events. The district court consolidated the cases.[6]

The government moved to dismiss the complaint for lack of standing and for failure to state a claim. See Fed. R. Civ.

---

[6] The district court denied motions from the iDevelopment and Economic Association and the Commonwealth of Pennsylvania to intervene as plaintiffs, as well as from the Coalition to Stop Internet Gambling and the National Association of Convenience Stores which sought to intervene as defendants, though the district court allowed them to participate as amici curiae, along with the State of New Jersey and the Michigan Bureau of State Lottery.

The Kentucky Lottery Corporation, the Tennessee Education Lottery Corporation, the Virginia Lottery, the Rhode Island Lottery, the Colorado State Lottery Division, the North Carolina Education Lottery, the State of Delaware, the State of Idaho, the State of Vermont, the State of Mississippi, the State of Alaska, and the District of Columbia supported the Michigan Bureau of State Lottery's memorandum of law, which in turn supported the plaintiffs' motions for summary judgment.

P. 12(b)(1), (6). With the parties' consent, the district court converted the motion into one for summary judgment. The government, however, did not address the NHLC's argument that the Wire Act does not even apply to states. Rather, in its reply memorandum before the district court, the government attached the Deputy Attorney General's April 2019 Memo, penned that same day, which stated that the "[2018] OLC Opinion did not address whether the Wire Act applies to State lotteries and their vendors" and that DOJ was "now reviewing that question." April 2019 Memo.[7] The April 2019 Memo also instructed DOJ attorneys to "refrain from applying Section 1084(a) to State lotteries and their vendors . . . until the Department concludes its review," following which states would have ninety days to conform their operations to federal law. Id. Nevertheless, upon inquiry by the district court, the government argued orally that states are subject to the prohibitions of the Wire Act.

The district court denied the government's motion, instead granting summary judgment to the plaintiffs. After concluding that the plaintiffs had Article III standing, the court determined that the 2018 Opinion "constitute[d] final agency

---

[7] Twenty months later, the DOJ has not yet completed its review, explaining at oral argument that it has had other priorities.

action without an adequate alternative to APA review." N.H. Lottery Comm'n v. Barr, 386 F. Supp. 3d 132, 146 (D.N.H. 2019). The court also found that section 1084(a) applies only to bets or wagers on sporting events or contests. Id. at 157. The court did not address the NHLC's alternative argument that the Wire Act does not apply to states. As for the remedy, the district court granted the plaintiffs' request for declaratory relief and declared that "§ 1084(a) of the Wire Act applies only to transmissions related to bets or wagers on a sporting event or contest." Id. at 160. It proceeded to "set aside" the erroneous 2018 Opinion under section 706(2)(A) of the APA, as requested by the NHLC (and several amici). Id. at 158–59. Finally, the court denied injunctive relief. Id. at 159–60.

The government timely appealed. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

### A.

We first consider whether this case presents a justiciable case or controversy. See U.S. Const. art. III, § 2. Pre-enforcement review of a criminal statute implicates doctrines of standing, ripeness, and (sometimes) mootness. This court

– 16 –

reviews these threshold questions de novo.  Mangual v. Rotger-Sabat, 317 F.3d 45, 56 (1st Cir. 2003).

**1.**

"The doctrine of standing gives meaning to the[] constitutional limits [of Article III] by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'"  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014) ("SBA List") (third alteration in original) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).

The burden lies with the plaintiff to show an injury in fact that is "fairly traceable to the challenged action" and that likely "will be redressed by a favorable decision."  Massachusetts v. U.S. Dep't of Health & Hum. Servs., 923 F.3d 209, 221–22 (1st Cir. 2019) (quoting Lujan, 504 U.S. at 560).  This case primarily concerns the injury-in-fact requirement, there being no question that injury, if any, can be traced directly to the government's threatened enforcement of the Wire Act and can be redressed in this action.  See, e.g., SBA List, 573 U.S. at 158.  To satisfy standing, the injury in fact "must be concrete and particularized and actual or imminent, not conjectural or hypothetical."  Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (internal quotation marks omitted) (quoting SBA List, 573 U.S. at 158).  "[A] future injury" is imminent "if the threatened injury is certainly

- 17 -

impending, or [if] there is a substantial risk that the harm will occur." Id. (second alteration in original) (internal quotation marks omitted) (quoting SBA List, 573 U.S. at 158).

"In certain circumstances, 'the threatened enforcement of a law' may suffice as an 'imminent' Article III injury in fact." Id. (quoting SBA List, 573 U.S. at 158-59). "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." SBA List, 573 U.S. at 158 (first citing Steffel v. Thompson, 415 U.S. 452, 459 (1974); and then citing MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007)). We do not "require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." MedImmune, 549 U.S. at 129. Although a plaintiff must demonstrate a "specific threat of prosecution . . . , just how clear the threat of prosecution needs to be turns very much on the facts of the case and on a sliding-scale judgment that is very hard to calibrate." N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1, 4-5 (1st Cir. 2000).

The plaintiffs here satisfy the injury-in-fact requirement. It is uncontested that the plaintiffs use wire communication facilities for the interstate transmission of bets and wagers in the running of the New Hampshire lottery and iLottery platform. The 2018 Opinion, which adopted a broad reading of

activities prohibited by section 1084(a), expressly mentions such lotteries, suggesting that Congress need amend the statute if it wishes to protect reliance interests, including those of the states. Removing any doubt regarding the enforcement of its new view, DOJ's subsequent memoranda made clear that DOJ attorneys must "adhere" to that view, and that any discretionary forbearance was limited to a brief window of time.

We know, too, that when DOJ attorneys last held the view expressed in the 2018 Opinion (between 2005 and 2011), DOJ had prosecuted seventeen cases involving non-sports betting under the Wire Act. That history of past enforcement against the same conduct supports a finding of injury in fact for pre-enforcement standing. See SBA List, 573 U.S. at 164 (finding that history of "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" and therefore reflects a substantial risk of harm (quoting Steffel, 415 U.S. at 459)). While the government points out that none of those pre-2011 enforcement actions were brought against state lotteries, the government has not articulated any reason why this is a distinction that makes a difference. As NeoPollard puts it, the 2018 Opinion did not "expressly state that it applies in northeastern states or that it applies to corporations whose names end in 'd,' either, but [DOJ] has given no reason to think that being a [lottery]

– 19 –

vendor is any more useful a defense" against enforcement under the government's reading of the statute.

In any event, the lack of current prosecutions against state lotteries is not dispositive. See R.I. Ass'n of Realtors v. Whitehouse, 199 F.3d 26, 32 (1st Cir. 1999). As evidenced by DOJ's other prosecutions of non-sports betting, "the record contains no realistic basis for a suggestion that the statutory provision . . . has fallen into desuetude." Id. Here, DOJ affirmatively warned a state that it believed selling lottery tickets over the internet violated the Wire Act and, in the lead-up to the 2011 Opinion, provided similar advice to inquiring authorities from two states.

The government alternatively argues that even if DOJ had effectively announced that the Wire Act applies to state lotteries, that would not lead to a credible threat of prosecution against New Hampshire's lottery specifically. We disagree, and our prior decision in Hemp Council offers a helpful illustration.

There, Derek Owen, a New Hampshire state legislator, had sought to pass a bill that would allow cultivation of "industrial hemp" from the cannabis sativa plant. Hemp Council, 203 F.3d at 3. An official from the U.S. Drug Enforcement Administration ("DEA") testified during a hearing on the bill that the DEA viewed the cultivation of cannabis sativa plants, regardless of the

grower's purpose, as the illegal manufacture of marijuana under federal law.  Id.  After the bill was defeated, Owen and the New Hampshire Hemp Council sought a declaratory judgment that interpreted the Controlled Substances Act, 21 U.S.C. § 841(a)(1), as not criminalizing "non-psychoactive" cannabis sativa.  Id. at 3-4.  This court found pre-enforcement standing because the DEA had expressed its view that the conduct Owen sought to engage in violated federal law.  Id. at 5; accord Monson v. U.S. Drug Enf't Admin., 589 F.3d 952, 958 (8th Cir. 2009).

The government attempts to distinguish Hemp Council because here there is no history of prosecuting state lotteries. But this court did not require the Hemp Council plaintiffs to prove that Owen or industrial hemp producers more generally had been previously prosecuted.  203 F.3d at 5; see also Blum v. Holder, 744 F.3d 790, 798 n.11 (1st Cir. 2014) (noting "the assumption that the state will enforce its own non-moribund criminal laws, absent evidence to the contrary").  Accordingly, we find the situation before us analogous to Hemp Council, except that, unlike in Hemp Council, the plaintiffs here have been openly engaging in the conduct deemed criminal by OLC.  The plaintiffs already have it all on the line, so to speak.  See MedImmune, 549 U.S. at 134 ("The rule that a plaintiff must destroy a large building, bet the farm, or . . . risk treble damages and the loss of 80 percent of

- 21 -

its business before seeking a declaration of its actively contested legal rights finds no support in Article III.").

In a similar vein, the government argues that the plaintiffs cannot prove standing (or ripeness) because, according to it, the April 2019 Memo clarifies that DOJ has no position on whether section 1084(a) applies to state lotteries and that DOJ making up its mind on this question is an unsatisfied precondition to enforcement. See Reddy, 845 F.3d at 502 (finding a precondition to enforcement -- a third party demarcating a buffer zone -- was a "contingent future event[] that might not occur as anticipated, or indeed may not occur at all" (alteration in original) (quoting Texas v. United States, 523 U.S. 296, 300 (1998))). The government attempts to equate its newly professed uncertainty about the Wire Act's application with an "unambiguous disclaimer of coverage," which can undermine standing in pre-enforcement cases. Hemp Council, 203 F.3d at 5; see also, e.g., Blum, 744 F.3d at 799 ("For its part, the Government has disavowed any intention to prosecute plaintiffs for their stated intended conduct because, in its view, that conduct is not covered by [the statute].").

The April 2019 Memo does not undermine the plaintiffs' claim of standing. The April 2019 Memo leaves in place all provisions of the 2018 Opinion and the January 2019 Memo, but grants a separate forbearance period to the enforcement of

section 1084(a) against state lotteries, "until [DOJ] concludes its review," from which date the plaintiffs will have only ninety days within which to comply. The government vaguely alludes to the additional questions that would arise from enforcing the Wire Act against state lotteries instead of a wholly private business. Yet, in the district court, the government "rejected the only argument put forward by the Lottery Commission that states are not covered by the [Wire] Act, and it . . . otherwise failed to identify any alternative legal theory as to why state actors might be exempt." N.H. Lottery Comm'n, 386 F. Supp. 3d at 143. Most notably, the government sticks to its position that the Wire Act is unambiguous in its application to non-sports betting, and offers no hint as to why that supposedly unambiguous text would not apply to, for example, a private actor such as NeoPollard.

The government exacerbates the threat posed by its prolonged coyness by limiting its professed forbearance to ninety days from whatever date it decides to opine. A state-wide operation integrating over a thousand retailers and multi-state relationships to produce almost 100 million dollars in net revenue does not strike us as an operation that can be easily wound-up in ninety days. Nor can a state legislature plan sensibly if such a relied-upon revenue stream finds itself suddenly subject to a three-month closure notice. On such a record, the government

"must proffer more than a conclusory assertion of inapplicability to convince us that the [plaintiffs] no longer face[] a credible threat of prosecution."  R.I. Ass'n of Realtors, 199 F.3d at 35.

**2.**

We next turn to ripeness.  While standing is concerned with "who" is bringing the challenge, ripeness is concerned with "when" the challenge is brought.  See McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 69-70 (1st Cir. 2003).  In the pre-enforcement context, however, the doctrines of standing and ripeness tend to overlap, so the preceding discussion largely applies here too. See SBA List, 573 U.S. at 157 n.5; R.I. Ass'n of Realtors, 199 F.3d at 33.

Ripeness analysis requires consideration of "fitness" and "hardship."[8]  See Reddy, 845 F.3d at 501 (citing Texas v. United States, 523 U.S. at 300-01).  Fitness involves issues of "finality, definiteness, and the extent to which resolution of the

---

[8]  The fitness prong has both jurisdictional and prudential components, while the hardship prong is solely prudential.  Reddy, 845 F.3d at 501 (citing Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89-90 (1st Cir. 2013)).  The Supreme Court has expressed doubt about whether the doctrine of prudential ripeness is consistent with the settled principle that a federal court has a "virtually unflagging" obligation to hear and decide cases within its jurisdiction.  SBA List, 573 U.S. at 167 (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125-26 (2014)).  We need not weigh in on this issue though, because, as we will explain, the plaintiffs here have satisfied the fitness and hardship prongs.  See id.

- 24 -

challenge depends upon facts that may not yet be sufficiently developed," while hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." R.I. Ass'n of Realtors, 199 F.3d at 33 (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995)). In the pre-enforcement context, a party's "concrete plans to engage immediately (or nearly so) in an arguably proscribed activity" gives a "precise shape to disobedience" and provides a "specific legal question fit for judicial review," and a showing that a "challenged statute, fairly read, thwarts" those plans can demonstrate hardship. Id.

Having maintained in its January memorandum that its temporary discretionary forbearance is not "a safe harbor for violations of the Wire Act," the government now argues that this case was unripe when filed and that the April 2019 Memo confirmed it. We disagree. As we have explained above, there is a "substantial controversy" over the meaning of the Wire Act, as it applies to the plaintiffs, "of sufficient immediacy and reality" -- prompted by DOJ's decision to seek reversal of OLC's 2011 position on the Wire Act and to adopt in full the 2018 Opinion -- "to warrant the issuance of the judicial relief sought." Reddy, 845 F.3d at 500 (internal quotation marks omitted) (quoting Lab. Rels.

<u>Div. of Constr. Indus. of Mass., Inc.</u> v. <u>Healey</u>, 844 F.3d 318, 326 (1st Cir. 2016)).

New Hampshire and its vendors should not have to operate under a dangling sword of indictment while DOJ purports to deliberate without end the purely legal question it had apparently already answered and concerning which it offers no reason to expect an answer favorable to the plaintiffs. According to NeoPollard's affidavit, it would be impossible for it to comply with the plain language of the 2018 Opinion without entirely shutting down the NHLC's iLottery platform. Given the unequivocal position in the 2018 Opinion, and the pre-2011 response given by DOJ to inquiring states, we cannot see why the plaintiffs should be forced to sit like Damocles while the government draws out its reconsideration. See <u>Hemp Council</u>, 203 F.3d at 5-6.

**3.**

Finally, we agree with the district court that the April 2019 Memo did not moot the case. See <u>N.H. Lottery Comm'n</u>, 386 F. Supp. 3d at 143. The April 2019 Memo does not rescind the government's adoption of the 2018 Opinion, nor does it offer the plaintiffs solace that the credible threat of prosecution has subsided.[9] DOJ is explicit that the forbearance period is not a

---

[9] Citing <u>Anderson</u> v. <u>Green</u>, 513 U.S. 557, 559 (1995) (per curiam), the government frames the issue as one primarily about

"safe harbor for violations of the Wire Act," but merely an "internal exercise of prosecutorial discretion." January 2019 Memo; see also City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983); R.I. Ass'n of Realtors, 199 F.3d at 36 ("[T]he only thing standing in the way of a criminal prosecution is the State's litigation position that it will voluntarily refrain from enforcing the statute according to its plain language." (quoting N.C. Right to Life, Inc. v. Bartlett, 168 F.3d 705, 711 (4th Cir. 1999))); id. ("[T]he only practical way for the Attorney General to assuage a reasonable fear of prosecution would be to disclaim, in categorical terms, any intent to enforce the prohibition . . . ."). The government refuses to disavow prosecuting state lotteries and their vendors for the conduct they currently engage in.

---

ripeness as opposed to mootness. The government argues that the district court only considered the April 2019 Memo as to mootness and not as to ripeness, which the government says was improper since it maintains that there was never a credible threat of enforcement of section 1084(a) against the plaintiffs (and therefore nothing to moot). Whatever one makes of this argument, the district court did consider the April 2019 Memo as to standing, which it noted overlaps with ripeness in the pre-enforcement context. N.H. Lottery Comm'n, 386 F. Supp. 3d at 141 n.5, 143. We have made similar observations, and, having already detailed why there was a credible threat of prosecution against the plaintiffs, we see no need to entertain this argument further.

- 27 -

For the foregoing reasons, we find the plaintiffs' pre-enforcement challenge justiciable and turn next to the merits and the relief granted.

**B.**

Both NHLC and NeoPollard brought claims under the Declaratory Judgment Act and the APA. Because we conclude that the plaintiffs are entitled to declaratory relief, we focus first on that claim before briefly addressing the disposition of the APA claim.

**1.**

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "In Declaratory Judgment Act cases where jurisdiction is exercised based on a threat of future injury," as here, "the potential injury is typically legal liability on a set of already defined facts, so that the Act merely 'defin[es] procedure' to enable judicial resolution of a case or controversy that might otherwise be adjudicated at a different time or in a slightly different form." In re Fin. Oversight & Mgmt. Bd. for P.R., 916 F.3d 98, 112 (1st Cir. 2019) (alteration in original) (quoting

<u>Aetna Life Ins. Co. of Hartford</u> v. <u>Haworth</u>, 300 U.S. 227, 240 (1937)).  Having already explained why the current controversy is justiciable, we see no abuse of discretion in the district court's willingness to entertain and resolve this controversy.  So we pivot to the merits of that controversy, which turn entirely on a question of statutory interpretation, calling for our de novo review.  See <u>Hernández-Miranda</u> v. <u>Empresas Díaz Massó, Inc.</u>, 651 F.3d 167, 170 (1st Cir. 2011).

**2.**

The parties invite us to view the text of the Wire Act as having two key clauses, each defining two prohibited uses of wire communication facilities:

<u>Clause One</u>

The transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers <u>on any sporting event or contest</u> (emphasis added).

<u>Clause Two</u>

The transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers.

The parties' disagreement trains on how broadly to apply the prepositional phrase "on any sporting event or contest" that appears at the end of Clause One.  The government argues that the

- 29 -

phrase qualifies only the second use of "bets or wagers" in Clause One. The plaintiffs contend that the phrase qualifies both uses of "bets or wagers" in Clause One, and that the term "bets or wagers" as used in Clause Two is shorthand for that qualified meaning in Clause One.

"[T]he plain meaning of a statute's text must be given effect," though "[w]e focus on 'the plain meaning of the whole statute, not of isolated sentences'" or phrases. Colón-Marrero v. Vélez, 813 F.3d 1, 11 (1st Cir. 2016) (quoting Arnold v. United Parcel Serv., Inc., 136 F.3d 854, 858 (1st Cir. 1998)). Words in a statute are not islands but "must be read in their context and with a view to their place in the overall statutory scheme." Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989)).

Each party argues that application of its preferred canon of construction requires its desired result. The government supports its position for a limited application of the sports-gambling qualifier by reference to the "rule of the last antecedent." "The rule provides that 'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" Lockhart v. United States, 136 S. Ct. 958, 962 (2016) (quoting Barnhart v. Thomas,

540 U.S. 20, 26 (2003)); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 144 (2012); Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 342–43 (2005) (invoking the last antecedent rule to prevent "stretch[ing] the modifier too far" to apply to other numbered clauses within a subparagraph). But see 2A Norman Singer & Shambie Singer, Sutherland on Statutes and Statutory Construction § 47:33 (7th ed. 2020) ("[W]here the sense of an entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the qualifying word or phrase is not restricted to its immediate antecedent."). According to the government, because the sports-gambling qualifier only appears in Clause One, and even then only once, after the words "information assisting in the placing of bets or wagers," it is limited to qualifying "bets or wagers" in that one instance.

This is certainly a plausible proposition in the abstract. But it does not end our inquiry. The last antecedent rule is "not an absolute and can assuredly be overcome by other indicia of meaning." Paroline v. United States, 572 U.S. 434, 447 (2014) (quoting Barnhart, 540 U.S. at 26); see also Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund, 138 S. Ct. 1061, 1076–77 (2018) ("[W]e have not applied the rule when the modifier directly follows a concise and 'integrated' clause." (quoting Jama, 543 U.S. at 344

n.4)); Buscaglia v. Bowie, 139 F.2d 294, 296 (1st Cir. 1943) (declining to apply the last antecedent rule where doing so would result in a construction "contrary to the natural or common sense meaning of the statute"). Indeed, even the government's position implicitly accepts the proposition that we should not apply the rule "in a mechanical way where it would require accepting 'unlikely premises.'" Paroline, 572 U.S. at 447 (quoting United States v. Hayes, 555 U.S. 415, 425 (2009)). Thus, for example, even the government concedes that, in the phrase "bets or wagers on any sporting event or contest," the sports-gambling qualifier applies not just to "wagers" (the actual last antecedent) but also to "bets."

For their part, the plaintiffs put forth the series-qualifier canon to argue that "on any sporting event or contest" should not be read as so confined and instead applies to both prohibited transmissions in the first clause: "bets or wagers" and "information assisting in the placing of bets or wagers." § 1084(a). According to the plaintiffs, a natural reading suggests that "on any sporting event or contest" is as applicable to the first reference to "bets or wagers" as it is to the second. See Paroline, 572 U.S. at 447 ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands

- 32 -

that the clause be read as applicable to all." (quoting Porto Rico Ry., Light & Power Co. v. Mor, 253 U.S. 345, 348 (1920))).[10]  From there, the plaintiffs posit that the statute's structure confirms that the term "bets or wagers" as used throughout section 1084 means the same thing, i.e., "bets or wagers on any sporting event or contest."

As the district court correctly concluded, the language and syntax of section 1084(a) "prevents the first clause from being a textbook application of either canon," and a third canon -- the punctuation canon -- fails to save the day.  N.H. Lottery Comm'n, 386 F. Supp. 3d at 150; see also id. at 149-50 ("Punctuation in a legal text . . . will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part." (quoting Scalia & Garner, supra, at 161)).  The district court explained:

---

[10]  The government's opening brief concedes that the series-qualifier rule operates elsewhere in the statute:

> [I]n the phrase "sporting event or contest," the word "'sporting' modifies both 'event' and 'contest.'"  Likewise, within Offense 2, the phrase "on any sporting event or contest" modifies both "bets" and "wagers" within the phrase: "assisting in the placing of bets or wagers on any sporting event or contest."

See also 2011 Opinion at 150 n.11 (examining whether "sporting" modifies only "event" and not "contest" and concluding that it modifies both).

> [A] comma before the conjunction "or" separating the phrases "bets or wagers" and "information assisting in the placing of bets or wagers" would demonstrate that the rule of the last antecedent applies. *See* 1A *Sutherland on Statutory Construction* § 21:15 (comma separating two members of a list indicates they are to be treated separately rather than as a whole); *cf.* *Lockhart*, 136 S. Ct. at 962 (applying rule of last antecedent to statute that had commas separating each antecedent). Without it, the appropriateness of the last antecedent canon is unclear. Conversely, a comma placed directly before the phrase "on any sporting event or contest" would confirm that the series-qualifier canon applies. *See* 2A *Sutherland on Statutory Construction* § 47:33 ("A qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.").

*Id.* at 150; *see* *Hayes*, 555 U.S. at 423 (explaining that imprecise punctuation did not counsel against the Court's decision to eschew the last antecedent rule).

The fact that the text of Clause One accommodates several possible readings does not mean that the statute entirely lacks clarity on the issue at hand. To affirm the district court's reading of the statute, we would need to find, among other things, that Clause Two also can be read as limited to betting on sporting events or contests.

Clause Two prohibits the transmission of a wire communication that entitles the recipient to "receive money or credit" either "as a result of bets or wagers" or "for information assisting in the placing of bets or wagers."  18 U.S.C. § 1084(a). The government argues that even if the sports-gambling qualifier can be construed to apply to both prohibitions in Clause One, Clause Two is safe from the qualifier's reach because there is no reference to sporting events or contests within it and because Clause Two is "grammatically independent of the first clause."

We have, however, what appears to be a clear example in this very statute of Congress using shorthand to carry over a phrase from Clause One to Clause Two, which may suggest a broader pattern of borrowing by shorthand.  The phrase "in interstate or foreign commerce" qualifies "transmission" in Clause One but is omitted from the text of Clause Two:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the <u>transmission in interstate or foreign commerce</u> of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the <u>transmission</u> of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers . . . .

Id. (emphases added).  Few though -- and certainly not this court -- would hesitate to find that Clause Two's "transmission" is shorthand for "transmission in interstate or foreign commerce."

To read the statute otherwise would be to presume that Congress understandably did not seek to prohibit use of the wires for intrastate bets yet inexplicably sought to prohibit intrastate activities necessary to such betting.

The government's only counter to this conclusion is that Congress may have eliminated the interstate commerce qualifier in Clause Two since that clause "more clearly" relates to economic activity, making the phrase unnecessary to ensure the statute's constitutionality. This argument, to put it mildly, gives the statute a "curious reach." United States v. Bass, 404 U.S. 336, 340 (1971) (finding the phrase "in commerce or affecting commerce" to apply beyond its nearest antecedent to all versions of the offenses listed). Accepting it would require us to think that Congress doubted that placing a bet was commerce that it could regulate, yet was certain that an intrastate communication entitling a bettor to be paid was commerce that Congress could regulate. We think it much more likely, indeed obvious, that Congress intended the term "transmission" in Clause Two to be shorthand for the "transmission in interstate or foreign commerce" described in Clause One. And that makes it more plausible that the same drafters could have intended "bets or wagers" in Clause Two to be a reference to the "bets or wagers on any sporting event or contest" described in Clause One.

- 36 -

The government nevertheless maintains that, even if Congress intended the interstate-commerce qualifier to apply throughout section 1084(a), that intention is of limited relevance to the sports-gambling qualifier because the two are "not parallel phrases." The government emphasizes that, even assuming the interstate-commerce qualifier is jurisdictional, the sports-gambling qualifier is not and therefore the rationale for carrying over that phrase is weaker. But our point here does not turn on the particular rationale for finding that Congress must have intended Clause Two to apply only to interstate transmissions. The point instead is that Congress implemented that intent with language that relies on an understanding of at least one Clause Two term as a shorthand reference to a more fully described and qualified Clause One term. In short, Congress's consistent syntactic approach anticipated that a term, which is explicitly qualified in one instance, could be read as similarly qualified in other instances, at least where necessary to avoid odd and unlikely results. Cf. Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 418 (2005) (finding evidence that Congress used a term "imprecisely" in one subsection to reflect term's meaning in another).

So we turn next to another principle of statutory construction: We do indeed prefer "the most natural reading" of

a statute, one that "harmonizes the various provisions in [it] and avoids the oddities that [a contrary] interpretation would create." Republic of Sudan v. Harrison, 139 S. Ct. 1048, 1057, 1060 (2019); see also Lockhart, 136 S. Ct. at 965 ("This Court has long acknowledged that structural or contextual evidence may 'rebut the last antecedent inference.'" (quoting Jama, 543 U.S. at 344 n.4)). Indeed, we have previously noted section 1084(a)'s use of "somewhat imprecise, conversational, language" and rejected a construction of it that "would lead to totally impractical results." Sagansky v. United States, 358 F.2d 195, 201 (1st Cir. 1966). Here, the government's impractical interpretation of section 1084 must give way to the plaintiffs' more natural reading.

The government's reading poses unharmonious oddities at two levels. Take first Clause One. Under the government's reading, anyone can transmit over the wires information assisting someone in placing a bet or wager over the wires on a non-sporting event, but the person receiving the assistance commits a crime if he then places the bet or wager. In short, there is no congruity between the two prohibitions in Clause One under the government's reading. Conversely, if we read "on any sporting event or contest" as qualifying both antecedents, harmony is restored: You cannot use the wires to place a bet or wager on a sporting event, and you

cannot use the wires to send information assisting in placing that bet or wager.

The government struggles to imagine some reason why Congress would have opted for the asymmetry of broadly barring the placing of bets or wagers while only narrowly barring assistance in placing bets or wagers. The government goes so far as to hazard that maybe information on how to place a bet or wager on a sporting event is more important to placing the bet or wager. How that is so (e.g., how one needs more assistance to bet on an NFL game than on the Oscars) the government does not say. Instead, it rather obscurely references "speech-related" concerns, implicitly suggesting that gambling on a basketball game raises fewer "speech-related" issues than gambling on whether it will snow on Christmas. That the government posits such strained explanations in order to make sense out of its reading tells much.

But, says the government, even if it would strain common sense not to apply the sports-gambling qualifier to both antecedents in Clause One, there is no reason to carry it down to Clause Two. That brings us to the second level of oddity posed by the government's reading of the statute: a lack of parallelism between Clause One and Clause Two. If Clause One is limited to sports betting (i.e., if it does not prohibit placing a bet on a lottery outcome), why in the world would Congress in the very next

clause outlaw telling the winning lottery participant that he is entitled to payment? Or to pay someone to assist lottery bettors? The plaintiffs' reading (and the 2011 OLC reading) avoids any need to answer such questions. Rather, reading the entire subsection as related to sports gambling, each prohibition "serve[s] the same end, forbidding wagering, information, and winnings transmissions of the same scope." 2011 Opinion at 144. The sensible result is:

> No person may send a wire communication that places a bet on a sporting event or entitles the sender to receive money or credit as a result of a sports-related bet, and no person may send a wire communication that shares information assisting in the placing of a sports-related bet or entitles the sender to money or credit for sharing information that assisted in the placing of a sports-related bet.

Id.

The lack of coherence in the government's proposed reading becomes even more apparent when we return to the text and consider the rest of section 1084. Section 1084(b) exempts from liability transmissions "for use in news reporting of sporting events or contests," and "transmission[s] of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into [one] in which such betting is [also] legal." 18 U.S.C. § 1084(b). Were the government correct, this exemption's exclusive focus on sporting events would seem

- 40 -

odd.  Why, for example, is there no exception for news reporting on other events upon which people might bet?  The government offers no reason to explain such a distinction.  Conversely, this question does not even arise if one reads section 1084(a) as limited to wagers and bets on sporting events and contests.

The government instead argues that section 1084(b) supports its position because Congress repeated a sports-gambling qualifier three times in section 1084(b), but only included the qualifier once in section 1084(a).  Thus, reasons the government, Congress clearly intended a difference in meaning.  See id. (excluding "transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal" (emphases added)).  Furthermore, the government argues, had the scope of section 1084(a) been restricted to sports gambling, the inclusion of the sports-gambling qualifiers in section 1084(b) would have been superfluous.

We agree with the government's premise that we should "presume[] that Congress intended a difference in meaning" when it "includes particular language in one section of a statute but omits it in another." Digit. Realty Tr., Inc. v. Somers, 138 S. Ct.

767, 777 (2018) (quoting Loughrin v. United States, 573 U.S. 351, 358 (2014)). But that presumption carries little force when the text itself offers a ready syntactic explanation for using different language in different sections. As the district court explained, unlike the consistent use of a single term ("bets or wagers") in section 1084(a), section 1084(b) employs "diverse phrases [that] are not susceptible to an abridged reference," thereby "requir[ing] that the modifier be repeated." N.H. Lottery Comm'n, 386 F. Supp. 3d at 154. Section 1084(b) refers to "news reporting of sporting events or contests," "bets or wagers on a sporting event or contest," and "betting on that sporting event or contest." § 1084(b) (emphases added). "[T]he varied syntax of each item in the list makes it hard for the reader to carry the . . . modifying clause across all three." Lockhart, 136 S. Ct. at 963.

Even less convincing is the government's broader argument that if the sports-gambling qualifier truly applied to all prohibitions of section 1084(a), then any reference to sports gambling in section 1084(b) would be superfluous. The government does not explain how one could avoid reference to sports gambling in section 1084(b) altogether. We struggle to imagine a way ourselves. Such a task seems especially difficult when part of section 1084(b) permits the transmission of information which

assists betting on a sporting event or contest but only where "betting on that sporting event or contest" is legal. § 1084(b) (emphasis added). In any event, while avoiding surplusage is definitely preferred, "avoid[ing] surplusage at all costs" is not, particularly where, as is the case here, syntax offers a good reason for why the qualifier was repeated in section 1084(b) (and we can't say we mind the added clarity). See Lockhart, 136 S. Ct. at 966 (quoting United States v. Atl. Rsch. Corp., 551 U.S. 128, 137 (2007)).

The government offers a couple of other reasons why we should prefer its reading over the plaintiffs'. Neither is persuasive. The government states that it is "difficult to credit" that Congress employed a shorthand when referring to "bets or wagers." It proposes obvious alternatives Congress might have used to more clearly express that "on any sporting event or contest" applied to each reference to "bets or wagers." Of course, we agree that there are many ways to improve the clarity of section 1084(a), but that is true of most statutes. Bass, 404 U.S. at 344 ("[W]e cannot pretend that all statutes are model statutes.").

Finally, the government points to Kellogg Brown & Root Services, Inc. v. United States, 135 S. Ct. 1970 (2015), as support for rejecting a consistent reading of "bets or wagers" throughout

section 1084(a).  There, the Court rejected the petitioners' argument to depart from the ordinary meaning of the term "pending" as used in the False Claims Act, and to instead construe the word as shorthand for "first-filed."  Kellogg Brown & Root Servs., 135 S. Ct. at 1978-79; see also 31 U.S.C. § 3730(b)(5) ("When a person brings an action . . . no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." (emphasis added)).  The Court pointed out that a shorthand term typically provides an expedient way to express "a lengthy or complex formulation" and "first-filed" is "neither lengthy nor complex."  Kellogg Brown & Root Servs., 135 S. Ct. at 1979.  Presaging our focus on avoiding odd and unlikely readings, the Court found that a reading applying the shorthand "would lead to strange results that Congress is unlikely to have wanted" and that the proposed definition "d[id] not comport with any known usage of the term 'pending.'"  Id.  Here, by contrast, "bets or wagers on any sporting event or contest" is a lengthier term more readily calling for use of a shorthand reference.  And, more importantly, reading section 1084(a) as employing such a reference avoids, rather than creates, "strange results that Congress is unlikely to have wanted."  Id.

**3.**

As the foregoing discussion explains, we find the text of section 1084 not entirely clear on the matter at hand, and we find that the government's resolution of the Wire Act's ambiguity would lead to odd and seemingly inexplicable results. Under the government's view, either Congress outlawed lottery betting over the wires while simultaneously allowing lotteries to provide assistance over the wires in placing lottery bets, or Congress allowed lottery betting over the wires while outlawing use of the wires to tell the winner the results of his bet. Of course, if Congress clearly enacted such an oddly designed statute, we would have a different case. But the ambiguity we have discussed does not provide sufficient comfort that Congress intended such a dubious result.

The legislative history provides further support for our judgment that Congress likely did not intend the strange results inherent in the government's reading. In fact, the legislative history contains strong indications that Congress did indeed train its efforts solely on sports gambling. The statute as originally presented to Congress plainly aimed only at sports gambling. The language then contained only one clause, and it used commas to clearly indicate its focus on sports gambling. See S. 1656, 87th Cong. § 2 (Apr. 18, 1961) ("the transmission in interstate or

foreign commerce of bets or wagers, or information assisting in the placing of bets or wagers, on any sporting event or contest"); The Attorney General's Program to Curb Organized Crime and Racketeering: Hearings on S. 1653, S. 1654, S. 1655, S. 1656, S. 1657, S. 1658, S. 1665 Before the S. Comm. on the Judiciary, 87th Cong. 277-79 (1961) (statement of Herbert Miller, Assistant Att'y Gen., Crim. Div.) ("This bill, of course, would not cover [gambling on other than a sporting event or contest] because it is limited to sporting events or contests."); see also 2011 Opinion at 141-47.  The government argues that Congress broadened its aim beyond sports gambling when the original draft was amended, most particularly when the commas bracketing the words "or information assisting in the placing of bets or wages" disappeared.  But as the district court explained, the absence of both commas merely created an ambiguity.  N.H. Lottery Comm'n, 386 F. Supp. 3d at 150.  The Senate report describing the amendments offered no hint that a major change was made or intended.  See S. Rep. No. 87-588, at 1-2 (1961); cf. City of Chicago v. Fulton, No. 19-357, 2021 WL 125106, at *4 (U.S. Jan. 14, 2021) (stating that "it would have been odd for Congress to accomplish [an important change to a statute] by simply adding" a short phrase that did "not naturally comprehend" the suggested new meaning); Kellogg Brown & Root Servs., 135 S. Ct. at 1977 ("Fundamental changes in the scope of

a statute are not typically accomplished with so subtle a move.").

And there is nothing in any of the committee reports to suggest

any reason at all for the inconsistent scope of the prohibitions

that the government's present position would require us to assume.

Such "silence in the legislative history . . . cannot defeat the

better reading of the text and statutory context."  Encino

Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1143 (2018).

**4.**

We come to the end of our analysis.  The text of the

Wire Act is not so clear as to dictate in favor of either party's

view.  The government's reading of the statute, however, would

most certainly create an odd and unharmonious piece of criminal

legislation.  Neither common sense nor the legislative history

suggests that Congress likely intended such a result.  Like the

Fifth Circuit, and the district court in this case, we therefore

hold that the prohibitions of section 1084(a) apply only to the

interstate transmission of wire communications related to any

"sporting event or contest."

**C.**

We now turn to the relief granted by the district court.

By way of the Declaratory Judgment Act, the district court declared

"that § 1084(a) of the Wire Act, 18 U.S.C. § 1084(a), applies only

to transmissions related to bets or wagers on a sporting event or

contest." N.H. Lottery Comm'n, 386 F. Supp. 3d at 160. The district court specified that the declaration "binds the United States vis-à-vis NeoPollard and the [NHLC] everywhere the plaintiffs operate or would be otherwise subject to prosecution." Id. at 158. Neither party contests the scope of the district court's declaration, and we agree that it is "responsive to the pleadings and issues presented." Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 42 (1st Cir. 2006) (quoting St. Paul Fire & Marine Ins. Co. v. Lawson Bros. Iron Works, 428 F.2d 929, 931 (10th Cir. 1970)).

The government urges the court to exercise its discretion to withhold declaratory relief for many of the same reasons it argues the case is non-justiciable. Having already rejected these arguments above, we decline to do so. See MedImmune, 549 U.S. at 129 ("The dilemma posed by that coercion -- putting the challenger to the choice between abandoning his rights or risking prosecution -- is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 152 (1967))).

The district court also granted the plaintiffs relief under the APA. While actions under the Declaratory Judgment Act and the APA can be maintained together, see Abbott Lab'ys, 387 U.S. at 153; Bos. Redev. Auth. v. Nat'l Park Serv., 838 F.3d 42,

- 48 -

48 (1st Cir. 2016), we find it unnecessary here to determine whether to "hold unlawful and set aside [an] agency action," 5 U.S.C. § 706(2), where the remedy provided by the Declaratory Judgment Act is adequate under the circumstances, see id. § 704 (providing for judicial review of "final agency action for which there is no other adequate remedy in a court" (emphasis added)).[11] Therefore, we vacate the district court's order only to the extent that it grants relief under the APA.

## III.

In conclusion, we find that the plaintiffs' claims are justiciable and that the Wire Act applies only to interstate wire communications related to sporting events or contests. Therefore, we affirm the district court's grant of the plaintiffs' motions for summary judgment and its denial of the government's motion to dismiss and motion for summary judgment, but, given that declaratory relief under the Declaratory Judgment Act is sufficient, we vacate the district court's grant of relief under the APA. Costs are awarded in favor of the appellees.

---

[11] Recognizing that relief under the Declaratory Judgment Act is discretionary, we make no comment on whether the statute would provide an "other adequate remedy" if the district court had declined to grant relief under it.